682 A.2d 356

**COMMONWEALTH of Pennsylvania, Appellant,**

**v.**

**Jesse Eugene RENNINGER.**

Superior Court of Pennsylvania.

Argued June 12, 1996.

Filed Aug. 8, 1996.

422

Patrick T. Barry, Assistant District Attorney, Middlesburg, for Commonwealth, appellant.

Michael C. Morrone, Williamsport, for appellee.

Before TAMILIA and JOHNSON, JJ., and MONTEMURO, J.*

* Retired Justice assigned to the Superior Court.

TAMILIA, Judge:

The Commonwealth presents this appeal from the June 27, 1995 Order granting appellee's oral motion for judgment of acquittal following his conviction for driving under the influence of alcohol.[1] The Order was premised on the fact that the blood alcohol test relied upon by the Commonwealth analyzed only the supernatant of appellee's blood, rather than his whole blood, and the Commonwealth failed, at trial, to provide a formula for converting the alcohol content of the supernatant into the alcohol content of appellee's whole blood. As set forth by the trial court, the facts of this case are as follows.

At the hearing on the Defendant's Omnibus Pretrial Motion Trooper Curtis Cooke of the Pennsylvania State Police testified that on August 2, 1994, he was assigned to the Crime Unit of the Selinsgrove Barracks of the Pennsylvania State Police. While Trooper Cooke was working in the barracks the Defendant presented himself at the barracks to file a complaint.

While Trooper Cooke was speaking with the Defendant, Trooper Cooke detected a strong odor of a [sic] alcoholic beverage about the person of the Defendant. Trooper Cooke also observed that the Defendant's eyes were glassy and bloodshot. When the Defendant left the barracks

1. Appellant was charged under 75 Pa.C.S. § 3731(a), which provides in pertinent part as follows:

**§ 3731. Driving under influence of alcohol or controlled substance**
    **(a) Offense defined.**—A person shall not drive, operate or be in actual physical control of the movement of any vehicle:

    .        .        .        .        .

    (4) while the amount of alcohol by weight in the blood of the person is 0.10% or greater; or
    (5) if the amount of alcohol by weight in the blood of the person is 0.10% or greater at the time of a chemical test of a sample of the person's breath, blood or urine, which sample is:
        (i) obtained within three hours after the person drive, operated or was in actual physical control of the vehicle; or
        (ii) if the circumstances of the incident prevent collecting the sample within three hours, obtained within a reasonable additional time after the person drove, operated or was in actual physical control of the vehicle.
Appellant was convicted of violating (a)(5) and found not guilty of violating (a)(4).

Trooper Cooke observed the Defendant walk toward a pickup truck parked in the parking lot, but could not determine if the Defendant was driving this vehicle, or if someone else in the vehicle was operating the vehicle. Based upon his observations of the Defendant and his uncertainty as to whether the Defendant was operating the pickup truck, Trooper Cooke broadcast a radio message to the State Police cruisers on patrol, giving a description of the vehicle, the Defendant's name, Trooper Cooke's observations regarding the smell of alcohol, the appearance of the Defendant's eyes, and Trooper Cooke's concerns that the Defendant may be operating a motor vehicle while under the influence of alcohol.

Trooper Ricky Goodling testified that while on routine patrol as a member of the Pennsylvania State Police on August 2, 1994, he heard the radio broadcast of Trooper Cooke. Trooper Goodling testified that he had recalled seeing the vehicle that was the subject of the radio broadcast parked at the barracks previously. After the radio call from Trooper Cooke, Trooper Goodling parked some distance to the east of the barracks along U.S. Route 522, which is the highway upon which the Selinsgrove Barracks is located. While parked there monitoring traffic he observed the Defendant's vehicle traveling east toward Selinsgrove on U.S. Route 522. Trooper Goodling pulled out behind the Defendant's vehicle and followed it for approximately two (2) to three (3) miles. While following the Defendant's vehicle he observed it crossed the center line of the highway one (1) time by approximately one-half (½) a tire width.

The Defendant turned off U.S. Route 522 onto Broad Street in Selinsgrove, and then turned and stopped his vehicle. Trooper Goodling testified that he did nothing to indicate to the Defendant that he should stop, and that the Defendant pulled into the parking lot and the parking stall, stopping his vehicle, completely on the Defendant's own.

Trooper Goodling approached the Defendant's vehicle. The Defendant, who was driving the pickup truck, rolled

down the driver's window before Trooper Goodling approached. When Trooper Goodling approached the Defendant he detected an odor of alcoholic beverage about the Defendant's person. Trooper Goodling asked the Defendant to exit his vehicle and perform a preliminary breath test on a device which the Pennsylvania State Police, Selinsgrove Barracks, maintains in the police cruisers. The test results were a .13, above the legal .10 blood alcohol limit. 75 Pa.C.S.A. Sec. 3731(a)(4) and (5). We acknowledge that such a preliminary breath test may be used only to establish probable cause to arrest.

Trooper Goodling did not ask the Defendant to perform any field sobriety tests. He decided not to arrest the Defendant for driving under the influence of alcohol, given that the Defendant pulled into the parking lot safely, parked his vehicle, and indicated that he would leave his vehicle there and would call his wife to come and pick him up. Trooper Goodling radioed to the barracks as to what had transpired and left the Weis Market[']s parking lot.

After Trooper Goodling's radio call, Trooper Cook [sic] left the barracks and proceeded east on U.S. route 522, in the same direction in which the Defendant had traveled to arrive at the Weis Market parking lot. As Trooper Cooke proceeded he observed the Defendant operating his pickup truck in the opposite direction. This transpired approximately ten (10) minutes after the Defendant left Trooper Cooke at the barracks. Trooper Cooke, who was caught in traffic, made a radio broadcast advising those troopers on routine patrol that he observed the subject pickup truck traveling west on U.S. route 522 toward Kreamer, Pennsylvania. Trooper Cooke's observation of the Defendant traveling west on U.S. Route 522 occurred approximately five (5) minutes after Trooper Cooke had received the radio call from Trooper Goodling.

Trooper Ryan Maxwell of the Pennsylvania State Police testified that while on routine patrol on August 2, 1994, he heard the initial radio broadcast by Trooper Cooke, the subsequent broadcast by Trooper Goodling, and the second

radio broadcast from Trooper Cooke concerning Trooper Cooke's observation of the Defendant traveling west on U.S. Route 522. Trooper Maxwell, who was also traveling west on U.S. route 522 toward Kreamer, parked his cruiser in a position where he could observe traffic traveling west on U.S. Route 522 toward Kreamer. He then observed the Defendant's vehicle traveling west on U.S. Route 522, activated his emergency lights, and subsequently stopped the Defendant.

Trooper Maxwell approached the Defendant and asked the Defendant for his license, registration, and insurance cards. He detected an odor of alcohol on the Defendant's breath and observed that the Defendant's eyes were bloodshot. When Trooper Maxwell asked the Defendant for his cards the Defendant stated, "I knew I shouldn't have done it," or words to the effect.

Trooper Maxwell placed the Defendant under arrest for driving under the influence of alcohol.

(Slip Op., Woelfel, J., 6/27/95, pp. 1–4.)

Following his arrest, appellee was transported to Evangelical Community Hospital and blood alcohol testing was conducted which, the parties stipulated at trial, revealed a blood alcohol content of .167 per cent. On December 22, 1994, appellee filed his omnibus pretrial motion, seeking, inter alia, suppression of the blood alcohol test results on the basis that the testing machine utilized, the DuPont ACA–IV, analyzed only supernatant, rather than whole blood. On January 20, 1995, a hearing on appellee's motion was held and the court took judicial notice of two provisions of the Pennsylvania Bulletin in which the Department of Health published its certification of Evangelical Community Hospital as a laboratory approved to conduct blood alcohol testing pursuant to the Vehicle Code (N.T., 1/20/95, p. 69).[2] Other than argument, appellee presented no evidence or testimony at the suppression hearing attacking the validity of the blood test and his

---

2. The first Pennsylvania Bulletin is identified as Volume 24, No. 1, January 1, 1994. The second is identified only by date, August 27, 1994.

motion to suppress was denied by Order dated March 29, 1995. Appellee's nonjury trial was held on March 31, 1995 and the Commonwealth presented its case exclusively through the incorporated suppression hearing testimony of Troopers Cooke, Goodling and Maxwell. The sole witness called on behalf of appellee was Joan Moilanen, the technologist at Evangelical Hospital who conducted the alcohol testing on appellee's blood. At the conclusion of the evidence, appellee was found guilty of violating section 3731(a)(5). Immediately following the court's verdict, appellee made an oral motion for judgment of acquittal on the basis that the Commonwealth had failed to meet its burden of proving the amount of alcohol in his whole blood. By Order dated June 27, 1995, the court granted appellee's motion and this Commonwealth appeal followed.

The Commonwealth claims the trial court's grant of appellee's motion for judgment of acquittal was erroneous for two reasons. "First, although the Court has stated that its Order was predicated on an 'insufficiency of evidence' theory, it is clear and inescapable that the 'insufficiency' was the very issue raised, litigated, and ruled against the Appellee in his Motion to Suppress." (Appellant's brief at 11.) Thus, according to the Commonwealth, the court's post-trial grant of acquittal constituted an improper reversal of its pretrial denial of appellee's motion to suppress. Secondly, the Commonwealth claims "even within the realm of 'insufficiency', the court's ruling constitutes reversible error [because] no where in her testimony does [Ms. Moilanen] testify that the test she performed upon the appellee's blood was anything other than a test upon his whole blood as deemed appropriate by the Pennsylvania Department of Health." (Appellant's brief at 11–12.)

Initially, as to the Commonwealth's claim that the trial court's acquittal of appellee constituted a reversal of the pretrial suppression Order, the trial court, in its Opinion filed pursuant to Pa.R.A.P.1925(a), responds as follows:

Respectfully, we suggest that the District Attorney is confusing an absence of evidence on a crucial point with an

asserted reversing of our Order denying the Defendant's motion to suppress evidence. In fact, we did not reverse our ruling on the motion to suppress evidence. All of the testimony which the Commonwealth wished to present regarding the certification of the laboratory at Evangelical Community Hospital, the procedures used by that laboratory, and the results of the tests performed were admitted. What the Commonwealth did not present was the conversion factor that would convert the alcoholic content of the supernatant to a blood alcohol content of the Defendant's whole blood.... Simply because certain evidence, such as a laboratory being an approved laboratory to perform blood tests to determine blood alcohol content, is admitted does not necessarily mean that the presentation of evidence supporting that fact would be sufficient for the Commonwealth to meet[ ] its burden.

(Slip Op., Woelfel, J., 7/18/95, pp. 2–3.)

We agree with the trial court that by taking judicial notice of a laboratory's certification, upon which the denial of appellee's suppression motion was based, the court did not thereby create an *irrebuttable* presumption that the test results would satisfy the Commonwealth's burden of proof at trial. Such judicial notice operated only to shift the burden of proof as to the test's validity from the Commonwealth to appellee.

■ As we held in *Commonwealth v. Brown,* 428 Pa.Super. 587, 595, 631 A.2d 1014, 1018 (1993):

[J]udicial notice does not deny an opposing party the opportunity to disprove the fact sought to be judicially noticed. Therefore, a party who believes that, notwithstanding a lab's state approval and publication in the Pennsylvania Bulletin, some error in testing occurred, i.e., the improper timing of a test or an equipment malfunction, is free to present evidence of that error to rebut the inference created by judicial notice.... A party may convince the court that even though a lab has state approval, the circumstances surrounding his or her test were such that the results are not reliable.

*Id.* (citations omitted.) Thus, judicial notice of the laboratory's certification created a *rebuttable* presumption of validity which appellee had every right to attack at trial. In fact, this was clearly enunciated and understood by all parties at the suppression hearing, during which the following exchange occurred:

THE COURT: The Commonwealth made an oral motion regarding being relieved of the burden of presenting any testimony relating to the blood test if they introduced the Pennsylvania Bulletin regarding the Evangelical Community Hospital laboratory being an approved lab. That motion was granted.

. . . . .

The Order that was entered in this matter indicates that the Commonwealth's motion was granted and that they would be relieved of the burden.

Mr. Campana [defense counsel], it is your burden at this point to go forward. If you have not met the burden at the time scheduled, then the motion is going to be denied, and the evidence will not be suppressed. Now, again, I'm inclined to agree with [the District Attorney] that the law of the case would control.

DISTRICT ATTORNEY: I would say, Your Honor, to modify my position slightly, I think the law of the case would control with regard to the right of the Commonwealth to introduce its testimony. *If the defense in its defense would call an expert, I don't think that would be inappropriate.*

THE COURT: *I don't think that it can be precluded from challenging at that point and time,* but right now, all the Commonwealth has to do is present the Pennsylvania Bulletin.

. . . . .

DISTRICT ATTORNEY: What I'm looking at, Your Honor, is—the motion is a motion to suppress evidence. That motion has been denied. The question that comes in the defense of the case *is [defense counsel] going to be*

*prohibited from bringing forth an expert to challenge a test at that time. On the defense, I think they have every right to do that.* But I think in terms of our case today and also our case-in-chief, we can rest upon the certification.

(N.T., 1/20/95, pp. 4–10; emphasis added.) As this testimony indicates, all parties, including the Commonwealth, understood that the defense at trial could seek to rebut the presumption of validity established when the court took judicial notice of the laboratory certification. The suppression motion was denied on the basis that appellee did not attempt, via evidence or testimony, to rebut the presumption at the suppression hearing, but as all parties recognized, appellee was not precluded from attacking the blood test at trial. Thus, the post-trial judgment of acquittal reversed neither the denial of suppression nor the presumption of validity established at suppression when the court took judicial notice of the laboratory's certification. Rather, the trial court granted the Commonwealth every benefit of the presumption at trial and held appellee to the burden of overcoming that presumption. Simply because the court found that appellee had succeeded does not, as the Commonwealth suggests, indicate that the court "reversed" either the denial of suppression or the presumption upon which the denial was premised.[3] Were we to endorse the Commonwealth's position, the practical implication would be that state certification of a testing laboratory automatically establishes, beyond question, the accuracy of all testing conducted by that lab under all circumstances. Our courts will not countenance such an ironclad presumption. *See Brown, supra* at 595, 631 A.2d at 1018 ("[A] party who believes that, notwithstanding a lab's state approval and publication in the

---

**3.** The Commonwealth also claims it relied on the judicial notice of laboratory certification in deciding not to offer scientific testimony at trial as to the test's validity. However, as noted, the presumption raised by the judicial notice was rebuttable, *Brown, supra,* and therefore the Commonwealth was not entitled to rely on the judicial notice as irrebuttable proof at trial. In fact, the district attorney admitted as such at the suppression hearing. *See* N.T., 1/20/95, p. 8 ("[District Attorney]: Whether I would have [the lab technician] or some other expert available to rebut any defense [appellee] might bring up [at trial], that would be my decision.").

Pennsylvania Bulletin, some error in testing occurred ... is free to present evidence of that error to rebut the inference created by judicial notice."). Thus, we reject the Commonwealth's claim that the trial court reversed its pretrial suppression decision when it granted appellee's post-trial motion for judgment of acquittal.

We next consider the Commonwealth's claim that the trial court erred in concluding that appellee had successfully rebutted the presumption of sufficiency established when the court took judicial notice of the lab certification. As noted, the Commonwealth claims that "at no time did [Ms. Moilanen] present any fact or opinion within her expertise that the DuPont ACA or the procedures she utilized resulted in anything less than a 'whole blood' finding...." (Appellant's brief at 13.)

As the following excerpts indicate, the Commonwealth misconstrues Ms. Moilanen's testimony:

Q [DEFENSE COUNSEL]: Now, when you say [the pre-test procedure] precipitates out of the red cells, what do you—it takes out the red cells from the rest of the blood?

A So that after I mix them and put them in a centrifuge, I'm going to just work with the supernatant.

.   .   .   .   .

Q Now, how do you get the supernatant? Do you centrifuge—

A Centrifuge it for four minutes, and then I remove the supernatant.

Q And the supernatant is the—

A Is the clear liquid on the top and cells come to the bottom as a clot.

Q So the red cells are taken out. The clear liquid on top, which is called a supernatant, is utilized from that point on?

A   Yes, it is.

(N.T., 3/31/95, pp. 12–13.)

Q   When you—in the testing of the substance that you did in this case, if you define whole blood as blood from which none of its elements have been removed, is the substance that you injected in the machine supernatant?   Is that whole blood under that definition?

A   No, it is not whole blood.

.    .    .    .    .

Q   [DISTRICT ATTORNEY]: The question is, if you are aware, why does the instrument not test the entire whole blood?   Why is a precipitant removed?

A   The instrument cannot analyse [sic] whole blood at this point in time. . . .

.    .    .    .    .

Q   [DEFENSE COUNSEL]: And the machine cannot test whole blood?

A   No, it cannot.

(N.T. at 31–38.)

As this testimony indicates, Ms. Moilanen clearly and repeatedly stated that she did not test appellee's "whole blood." Further, Ms. Moilanen was unable to provide a calculation for extrapolating a whole blood alcohol content from the result of the supernatant test.

Q   [DEFENSE COUNSEL]: Is there documentation about a supernatant whole blood alcohol ratio?

A   No.

(N.T. at 52.)   We agree with the trial court that Ms. Moilanen's testimony rendered the Commonwealth's evidence insufficient.

In *Commonwealth v. Bartolacci,* 409 Pa.Super. 456, 598 A.2d 287 (1991), we addressed, as follows, "the apparent practice of testing blood serum", rather than whole blood:

While our statutes do not dictate in what form blood must be tested, only evidence of the amount of alcohol by weight

in the person's blood can support a conviction based upon a violation of § 3731. Where a test is performed on blood serum rather than whole blood, the fact finder must be informed of this and must be provided with evidence of the alcohol by weight in the defendant's blood in order to properly sustain a conviction based upon a violation of § 3731. Evidence offered of a reading based upon a test of blood serum, without conversion, will not suffice.... [W]e caution the Commonwealth that a conviction based upon a violation of § 3731(a)(4) will not be upheld absent clear evidence that the alcohol content in the defendant's blood is .10 per cent or greater and that evidence of test results based solely on blood serum will not suffice to sustain a conviction.

*Id.* at 459, 598 A.2d at 288.

Similarly, in *Commonwealth v. Wanner,* 413 Pa.Super. 442, 605 A.2d 805 (1992), we considered whether a blood alcohol analysis performed only on blood plasma would suffice for conviction under section 3731. In holding that it would not and vacating the defendant's conviction, we stated:

The Commonwealth presented a .136 per cent blood alcohol count as evidence of appellant's intoxication. The test which produced this reading was not performed on whole blood. Rather, a review of the record shows that the hospital performed a test on the blood plasma.... When a blood test is performed specifically for legal analysis, the test is performed on whole blood. "Whole blood" is defined as 'blood from which none of the elements have been removed.'.... [Instantly], [a] comprehensive review of the record shows that the Commonwealth did not produce any evidence that would allow the fact finder to convert the result of the plasma test into an amount of alcohol by weight in the whole blood. As the statute requires a 'whole blood' analysis, we see no reason to distinguish a test on serum from a test on plasma. As both plasma and serum tests are performed on only a portion of whole blood, both tests require conversion to establish the correlative whole blood test result. In the absence of any converting evidence,

appellant's convictions for driving while under the influence of alcohol and homicide by vehicle while driving under the influence of alcohol cannot be sustained.

*Id.* at 447–50, 605 A.2d at 807–809.

Although our courts have not specifically considered the validity of supernatant testing, we do not hesitate to find that *Bartolacci* and *Wanner* render such testing invalid unless converting evidence is provided to establish the alcohol content of whole blood. Since all three tests "are performed on only a portion of whole blood, [they] require conversion to establish the correlative whole blood test results", *Wanner, supra,* and we now hold that supernatant testing also requires such "converting evidence". *Id.*[4] In light of the absence of such evidence presented at appellee's trial, we are constrained to agree with the trial court that appellee successfully rebutted the presumption of validity established when the court took judicial notice of the laboratory's certification. Hence, the court was correct in finding that the Commonwealth failed to establish appellee's violation of section 3731(a)(5) beyond a reasonable doubt and judgment of acquittal was properly entered.

Based on the foregoing, we hold that the entry of judgment of acquittal did not reverse either the denial of appellee's suppression motion or the presumption of testing validity established when the trial court took judicial notice of the certification of Evangelical Community Hospital to conduct blood alcohol testing. Rather, that presumption was successfully rebutted via the testimony of the lab technician at trial, who failed to relate the results of supernatant testing to whole blood alcohol content, as required by our law. *Wanner, Bartolacci, supra.* For these reasons, the June 27, 1995

---

4. Webster's Medical Desk Dictionary, Merriam–Webster, Inc. (1986), p. 693, defines "supernatant" as "the usu[ally] clear liquid overlying material deposited by settling, precipitation, or centrifugation." In addition to Ms. Moilanen's testimony, this definition leaves no doubt that "supernatant" blood testing is not conducted on whole blood, which the *Wanner* court defined as "blood from which none of the elements has been removed[.]" *See Wanner, supra* at 448, 605 A.2d at 808, *citing* Dorland's Illustrated Medical Dictionary, Twenty–Fifth Edition, W.B. Saunders Co. (1974).

Order granting appellee's motion for judgment of acquittal was proper.

Order affirmed.