**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**Nelson Lee HAIGHT, Appellant.**

Superior Court of Pennsylvania.

Submitted April 2, 2012.

Filed July 23, 2012.

Brian V. Manchester, Bellefonte, for appellant.

Karen E. Kueble, Assistant District Attorney, Lock Haven, for Commonwealth, appellee.

BEFORE: STEVENS, P.J., BOWES, J., and STRASSBURGER, J.*

OPINION BY STEVENS, P.J.

This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Clinton County following Appellant's conviction on the charges of driving while under the influence of alcohol (DUI) (high rate of alcohol), 75 Pa.C.S.A. § 3802(b), driving without rear lights, 75 Pa.C.S.A. § 4303(b), and driving without seat belt fastened, 75 Pa.C.S.A. § 4581(a)(2). We affirm.

The relevant facts and procedural history are as follows: On October 15, 2010, at 11:20 p.m., Pennsylvania State Police Troopers Curtis A. Confer and Brian Kunes were on duty when they observed a vehicle driving without a functioning right brake light. N.T. 7/13/2011 at 7. The troopers effectuated a traffic stop of the vehicle and, upon approaching the driver, Trooper Confer noticed the driver was not wearing a seat belt. N.T. 7/13/11 at 8. Trooper Confer observed that the driver, who was later identified as Appellant, had red, glassy, bloodshot eyes, and he emitted the smell of alcohol. N.T. 7/13/11 at 9. Upon questioning, Appellant admitted that he had consumed four beers, and therefore, Trooper Kunes conducted field sobriety tests. N.T. 7/13/11 at 11–12. Appellant failed several of the field sobriety tests, and the troopers ultimately discontinued testing since they believed Appellant was unable to continue in a safe manner. N.T. 7/13/11 at 11–12, 47–48. Trooper Confer concluded that, under the totality of the circumstances, it was necessary for Appellant to "go for a blood draw," and therefore, the troopers transported Appellant to the Lock Haven Hospital, where blood was drawn from Appellant at 12:11 a.m., on October 16, 2010.

_____

* Retired Senior Judge assigned to the Superior Court.

N.T. 7/13/11 at 12–13. The troopers subsequently received a lab report from the Lock Haven Hospital indicating Appellant had a blood alcohol content (BAC) of .181%.

Procedurally, the Commonwealth charged Appellant with DUI (general impairment), 75 Pa.C.S.A. § 3802(a)(1), DUI (highest rate of alcohol), 75 Pa.C.S.A. § 3802(c), careless driving, 75 Pa.C.S.A. § 3714(a), driving without rear lights, 75 Pa.C.S.A. § 4303(b), and driving without seat belt fastened, 75 Pa.C.S.A. § 4581(a)(2). Appellant, who was represented by counsel, proceeded to a bench trial, at the conclusion of which the trial court found Appellant not guilty of DUI (general impairment), DUI (highest rate of alcohol), and careless driving. However, the trial court convicted Appellant of DUI (high rate of alcohol), 75 Pa. C.S.A.§ 3802(b), driving without rear lights, and driving without seat belt fastened. In convicting Appellant of DUI under Subsection 3802(b), the trial court stated the following:

> Count 2 charges [Appellant] with operating with a blood alcohol level of .16 percent or higher. The Commonwealth acknowledges that the testing done by the Lock Haven Hospital was performed on supernatant not on whole blood. Our appellate courts have held in a series of cases … that if the Commonwealth does not perform a whole blood test it must present a conversion factor in order to sustain a conviction. In order to meet that burden, the Commonwealth, by stipulation with [Appellant], introduced a report by Harry Kamerow, M.D., Staff Pathologist at Mount Nittany Medical Center, dated March 21, 2011. As we understand Doctor Kamerow's report, his position is that the result for supernatant testing is comparable to the results for whole blood testing. This opinion, the Commonwealth suggests, meets its burden of providing a conversion factor[.]

> [Appellant] introduced the testimony of Doctor Joseph Citron who, while generally disagreeing with Doctor Kamerow, did suggest at one point in his testimony that a conversion factor might exist with respect to the machine used by the hospital in testing. While Doctor Citron's general testimony was that there is no conversion factor for supernatant, if we were to use the figures set forth on [Appellant's] Exhibit 8 and apply those numbers to the .174 test result introduced as Commonwealth Exhibit 2,[1] we would reach a conversion figure of a .158. Although [Appellant] argues we cannot do that because such would be mere speculation, we find, after consideration of all of the testimony presented by both sides beyond a reasonable doubt, that this [Appellant's] blood level was .10 percent or greater and, therefore, find him guilty of violating Section 3802(b) not 3802(c) as originally charged by the Commonwealth....[W]e are not satisfied beyond a reasonable doubt that

---

1. At trial, the medical technician who tested the supernatant from Appellant's blood indicated that she ran two samples, as shown in Commonwealth Exhibit 2. N.T. 7/13/11 at 56–58. One of the samples revealed a BAC of .181% while the other sample revealed a BAC of .174%. *Id.* at 58, 60–61. The technician explained that she provides the police with the BAC from whichever sample she runs first, which in this case revealed a BAC of .181%, and the reason she runs two samples is to ensure the machine is operating properly. *Id.* at 58–61. The trial court apparently accepted as credible the evidence revealing that Appellant's BAC, as tested on the supernatant, was .174%. The trial court was free to make this credibility determination. *Commonwealth v. Jones,* 874 A.2d 108 (Pa.Super.2005).

[Appellant's] blood level was .16 [percent] or greater, only that his blood level was a .10 percent or greater.

N.T. 7/13/11 at 179–181 (footnotes added).

On August 22, 2011, the trial court sentenced Appellant to two days to six months in prison, as well as ordered him to pay fines and costs. Appellant filed a timely post-sentence motion, which the trial court denied, and this timely appeal followed. Although not ordered to do so, Appellant filed a Pa.R.A.P. 1925(b) statement, to which the trial court filed a brief Pa.R.A.P. 1925(a) response.

On appeal, Appellant contends that the evidence was insufficient to convict him under 75 Pa.C.S.A. § 3802(b). Specifically, he suggests the blood test introduced by the Commonwealth did not meet the legal requirements to demonstrate that Appellant had a BAC of at least 0.10% but less than 0.16%, which is necessary to support his conviction for DUI (high rate of alcohol) under Subsection 3802(b). In this regard, Appellant claims that the Commonwealth's blood test reflected only the percentage of alcohol in a "supernatant" sample of Appellant's blood, rather than reflecting the percentage of alcohol in Appellant's "whole blood." Therefore, Appellant argues, under existing law, the Commonwealth was required to prove a conversion of the blood alcohol level in the supernatant sample to a whole blood equivalent in order to establish the amount of alcohol in Appellant's whole blood, and since the Commonwealth failed to sufficiently do so, the evidence was legally insufficient for the trial court to convict Appellant under Subsection 3802(b).

Initially, we note our standard of review:

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [finder] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Jones,* 874 A.2d 108, 120 (Pa.Super.2005) (citations and quotations omitted).

In this case, Appellant was convicted of DUI pursuant to 75 Pa.C.S.A. § 3802(b),[2] which provides as follows:

(b) **High rate of alcohol.**—An individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the alcohol

---

**2.** Appellant has not challenged the sufficiency of the evidence as it relates to his remaining convictions.

concentration in the individual's blood or breath is at least 0.10% but less than 0.16% within two hours after the individual has driven, operated or been in actual physical control of the movement of the vehicle.

75 Pa.C.S.A. § 3802(b) (bold in original).

Thus, to sustain a conviction under Subsection 3802(b), the Commonwealth must prove: (1) Appellant was driving, operating, or in actual physical control of the movement of a vehicle, and (2) Appellant's BAC was is at least 0.10% but less than 0.16% within two hours of driving, operating, or being in control of the vehicle. *See* 75 Pa.C.S.A. § 3802(b). As indicated *supra*, Appellant's sufficiency of the evidence argument is focused on whether the Commonwealth met its burden of proving Appellant had a BAC of at least 0.10% but less than 0.16%.[3]

In support of his argument, Appellant cites to this Court's decision in *Commonwealth v. Renninger*, 452 Pa.Super. 421, 682 A.2d 356 (1996). In *Renninger*, we made it clear that supernatant blood alcohol test results are invalid "unless converting evidence is provided to establish the alcohol content of whole blood." We explained that where blood alcohol testing is performed on only a portion of whole blood, such as plasma, serum, or a supernatant sample, it requires conversion to establish the correlative whole blood test results. *Id.* Recently, in *Commonwealth v. Hutchins*, 2012 WL 604425 (Pa.Super.2012), we expounded on the necessity of whole blood test results as follows:

The general rule for alcohol related DUIs is that only tests performed on whole blood will sustain a conviction under Section 3802. Thus, evidence of blood serum, plasma or supernatant testing, without conversion, will not suffice. The reasoning for this rule rests on the distinction between whole blood and blood serum: The distinction between whole blood and blood serum is significant. Serum is acquired after a whole blood sample is centrifuged, which separates the blood cells and fibrin, the blood's clotting agent, from the plasma-the clear liquid i[n] the blood serum. When blood serum is tested the results will show a blood alcohol content which can range from between 10 to 20 percent higher than a test performed on whole blood. The reason for this is because the denser components of whole blood, the fibrin and corpuscles, have been separated and removed from the whole blood, leaving the less dense serum upon which the alcohol level test is performed. The value of the blood alcohol content in the serum is then determined. Because the serum is less dense than whole blood, the weight per volume of the alcohol in the serum will be greater than the weight per volume in the whole blood. Thus, an appropriate conversion factor is required to calculate the corresponding alcohol content in the original whole blood sample.

*Hutchins*, at *6 (citations omitted). *See Commonwealth v. Kohlie*, 811 A.2d 1010, 1013 (Pa.Super.2002) (holding that, in order to convict a defendant of DUI under Subsection 3802(b), the Commonwealth cannot rely on the blood serum analysis alone; it must introduce evidence of alcohol by weight in terms of whole blood).

██ In the present case, Appellant argues the Commonwealth failed to provide a sufficient conversion factor to translate the blood alcohol of the supernatant blood

---

**3.** We note that Appellant's blood was drawn and tested within two hours of the police stopping his motor vehicle.

sample to a whole blood equivalent in order to establish the alcohol content of Appellant's whole blood. In analyzing Appellant's argument, we must examine the testimony of Commonwealth witness Joy Ketchum, the medical technologist at the Lock Haven Hospital who tested Appellant's blood, the report of Commonwealth expert Harry Kamerow, M.D., a staff pathologist at Mount Nittany Medical Center, and the testimony of Joseph Citron, M.D., an expert who Appellant called to testify on his behalf.

At trial, Ms. Ketchum provided on direct examination the following relevant testimony with regard to the procedures she followed in determining Appellant's blood alcohol level:

Q: What instrument is used to actually test that blood?

A: Beckman Colter DXE 600.

Q: Do you have to prepare the blood sample in any way for the machine to test it?

A: Yes.

Q: What is that preparation?

A: We add 300 microliters of—it's called TCA and 300 microliters of the patient's sample, vortex it, spin it down, and then run the supernatant.

Q: When you say run the supernatant, can you tell us how the supernatant—what the supernatant is?

A: It basically breaks down the red blood cells so that the blood alcohol—or the alcohol content can be tested through the machine.

Q: Is—the supernatant that you test, is that a portion of what's in the tube or is the entire tube turned into supernatant?

A: Just a portion.

*     *     *

Q: Ma'am, I'm showing you what's been marked as Commonwealth Exhibit No. 2. Can you take a look at that and tell us what that is, please.

A: That is the generated lab report.

Q: And that is the official report that says what [Appellant's] blood test was, correct?

A: Yes.

Q: And what were the results that showed that-what were the results of the test of [Appellant's] blood?

A: 181.

*     *     *

Q: Ma'am, did you follow the procedures that are set forth by the Department of Health in conducting this test?

A: Yes, I did.

N.T. 7/13/11 at 55–59. Ms. Ketchum testified that she tested the supernatant portion of Appellant's blood in order to arrive at Appellant's BAC. N.T. 7/13/11 at 81.

Having established Ms. Ketchum tested the supernatant portion of Appellant's blood, the Commonwealth offered the expert report of Dr. Kamerow as converting evidence to establish the alcohol content of Appellant's whole blood. In his report, Dr. Kamerow opined that "the alcohol concentration in the supernatant is not significantly different from the alcohol concentration in the aqueous phase of prepared whole blood submitted for headspace gas chromatography." Dr. Kamerow's Report dated 3/21/11 at 2. Dr. Kamerow indicated that, as opposed to multiple studies addressing the ratio of ethanol in serum as compared to ethanol in whole blood, "clinical chemists have not extensively studied the relationship of ethanol concentration in supernatants determined by biochemical methodology as compared to ethanol concentration in whole blood determined by gas chromatography." *Id.* However, he noted that, in one small study, the result was "a ratio of 1.05:1 in terms of ethanol concentrations in treated whole blood (su-

pernatant) as determined by gas chromatography compared to ethanol concentrations in whole blood determined by gas chromatography." *Id.* at 3. Thus, he opined that "the community of clinical chemists and toxicologists accept that the ethanol concentration in supernatant is equivalent to the ethanol concentration in whole blood." *Id.* at 3. He further noted that the chemistry information sheets, which are used for the Lock Haven Hospital instruments, "indicates a correlation coefficient of 0.997 between the whole blood alcohol dehydrogenase assay used at the Lock Haven Hospital, utilizing the supernatant/precipitate method, and ethanol assays performed on whole blood by gas chromatography." *Id.* Dr. Kamerow opined that "[t]his remarkably high correlation coefficient indicates that ethanol concentrations determined on supernatant by the biochemical method are remarkably similar to ethanol concentrations determined on whole blood by gas chromatography on the same samples." *Id.* at 4. Thus, in sum, Dr. Kamerow determined that due to, *inter alia,* the ratio of 1.05:1, the ethanol concentration in the supernatant as processed by the Lock Haven Hospital is essentially equivalent to ethanol concentrations in whole blood. *Id.*

In order to rebut Dr. Kamerow's report, Appellant offered the expert testimony of Dr. Joseph Citron, who testified that, generally, there is no accepted "conversion range" for supernatant to whole blood. N.T. 7/13/11 at 126. However, when questioned by the trial court as to what the relationship is between ethanol concentrations determined on supernatant by the biochemical method and ethanol concentrations determined on whole blood by gas chromatography, Dr. Citron opined that supernatant results of .181% from the Lock Haven Hospital could be converted to a gas test on whole blood of .166%. N.T. 7/13/11 at 165. When asked what the con-

version would be if the trial court accepted as credible the supernatant result of .174%, which was the lower BAC from Appellant's two samples, Dr. Citron did not give a definitive percentage.

In rendering its verdict, the trial court accepted Ms. Ketchum's testimony that she determined Appellant's BAC by testing a sample of supernatant. The court then recognized Dr. Kamerow's opinion, which was contained within his report, that the ethanol concentration in Appellant's supernatant as processed in this case was essentially similar to the ethanol concentration in Appellant's whole blood. However, ultimately using proportions testified to by Dr. Citron, and assuming the supernatant was .174%, the trial court calculated the BAC percentage in Appellant's whole blood to be .158%.

We conclude the trial court's determinations are supported by the record. As indicated, the trial testimony revealed that the medical technician at the Lock Haven Hospital ran two supernatant samples to determine Appellant's BAC. The results revealed a BAC of .181% and .174%. In exercising its discretion, and giving Appellant the benefit of the doubt, the trial court determined that Appellant's BAC from the supernatant sample was .174%. Additionally, pursuant to *Renninger* and *Hutchins,* the trial court examined the evidence in order to make the appropriate conversion to calculate the corresponding alcohol content in Appellant's original whole blood sample. In this regard, the trial court, while noting Dr. Kamerow's opinion the supernatant results are similar to the results for whole blood testing, again gave Appellant the benefit of the doubt and noted that Appellant's own expert's calculations established that the supernatant sample of .174% would be converted to .158% alcohol content in Appellant's whole blood. Inasmuch as .158% is at least

0.10% but less than 0.16%, we find the evidence was sufficient to sustain Appellant's conviction for DUI under Subsection 3802(b).

■■■ We note we find unavailing Appellant's contention that the trial court improperly shifted the burden of proof to him when it relied upon Dr. Citron's testimony regarding conversion in concluding Appellant's alcohol content in his whole blood was, at most, .158%, thus convicting Appellant of DUI under Subsection 3802(b). Appellant suggests that, since the trial court did not credit Dr. Kamerow's report regarding conversion,[4] in the absence of Dr. Citron's testimony, the Commonwealth did not meet its burden of proving a conversion factor as is required for Subsection 3802(b). Thus, Appellant reasons, the trial court must have improperly shifted the burden of proof to Appellant.

Here, as indicated *supra*, Dr. Kamerow cited a study for the proposition that there is a ratio of 1.05:1 in terms of ethanol concentration in supernatants as compared to whole blood. Since the ratio was so small, Dr. Kamerow concluded that "the community of clinical chemists and toxicologists accept that the ethanol concentration in supernatant is equivalent to the ethanol concentration in whole blood." Dr. Kamerow's Report dated 3/21/11 at 3. Since Appellant stipulated to the admission of Dr. Kamerow's report, Appellant waived his opportunity to cross-examine Dr. Kamerow. However, Appellant offered his own expert, Dr. Citron, to rebut Dr. Kamerow's opinions. Ultimately, the trial court found Dr. Citron's testimony regarding conversion to be credible and convicted Appellant of having a lesser BAC than charged by the Commonwealth. That is, although Appellant was charged with Subsection 3802(c), the trial court convicted Appellant of the cognate offense of Subsection 3802(b). *See Commonwealth v. Sinclair*, 897 A.2d 1218 (Pa.Super.2006).

We conclude the trial court did not err in "bringing the charges into conformance with the evidence offered by the defendant," and that such did not improperly shift the burden of proof to him. *See Commonwealth v. Roser*, 914 A.2d 447, 453 (Pa.Super.2006). In sum, given these circumstances wherein Appellant sought to rebut the Commonwealth's expert's opinions with his own expert's opinions, the trial court did not improperly shift the burden of proof in believing Appellant's expert's testimony, which established a lesser BAC, thus convicting Appellant of the cognate offense under Subsection 3802(b). *See Roser, supra.* Simply put, the fact Appellant may not have foreseen the possibility that his defense strategy could result in a conviction under Subsection 3802(b), as opposed to Subsection 3802(c), does not result in the conclusion the trial court improperly shifted to him the burden of proof.

For all of the foregoing reasons, we affirm.

Affirmed.

BOWES, J. Files A Dissenting Opinion.

DISSENTING OPINION BY BOWES, J.:

While the majority ably details the law and facts of this matter, I respectfully depart from its conclusion that Appellant's own expert witness established a sufficient

---

4. To the extent Appellant suggests Dr. Kamerow's report should have been excluded since it was not based on a scientifically acceptable conversion factor, we note Appellant waived this claim. Specifically, Appellant did not object to the introduction of Dr. Kamerow's report, and, in fact, he stipulated to its admission. *See* Pa.R.A.P. 302 (issue waived if not presented in lower court).

basis for the trial court to convert Appellant's supernatant blood alcohol content of .174% to .158%. Accordingly, I offer this dissent.

The majority accurately states that conversion evidence must be provided when a person is charged with DUI and supernatant blood testing is conducted. *Commonwealth v. Hutchins*, 2012 PA Super 44, 42 A.3d 302; *Commonwealth v. Kohlie*, 811 A.2d 1010 (Pa.Super.2002); *Commonwealth v. Renninger*, 452 Pa.Super. 421, 682 A.2d 356 (1996). The Commonwealth below, however, as the trial court recognized, offered only an expert report that conversion evidence was unnecessary in this case. Hence, the majority correctly rejects the Commonwealth's expert report as a primary basis for supporting Appellant's conviction.

The Commonwealth, apparently recognizing its faulty premise at the trial level, now opines that its expert report did present a conversion method. The trial court, acting as the fact-finder, plainly rejected this assertion by utilizing a different conversion factor and stating in its verdict that the Commonwealth argued that it met "its burden of providing a conversion factor because [the Commonwealth] considered Doctor Kamerow's report to be proof there is no need for conversion." N.T., 7/13/11, at 180. While we may affirm on any basis supported in the record, we cannot sustain a conviction based on facts expressly rejected by the factfinder.[5] Indeed, the majority properly disregards the Commonwealth's argument in this respect and instead affirms based largely, as did the trial court, on the testimony of Appellant's expert, Dr. Joseph Citron.

Preliminarily, I note that I am in agreement with the majority insofar as it states that the fact-finder could properly consider Dr. Citron's testimony in determining Appellant's guilt, although he was not a Commonwealth witness. A fact-finder is permitted to consider all evidence that is introduced in reaching its verdict, not merely testimony from Commonwealth witnesses. Plainly, cross-examination of a defense witness may be used in convicting a defendant. In this case, the trial court's questioning, and not the Commonwealth's, introduced much of the testimony that the majority relies on in reaching its decision. Nonetheless, I agree with Appellant to the extent that he contends inadequate testimony regarding a conversion factor was presented in this case.

I first highlight the trial court's specific findings in reaching its verdict. The court stated,

> Defendant introduced the testimony of Doctor Joseph Citron who, while generally disagreeing with Dr. Kamerow, did suggest at one point in his testimony that a conversion factor might exist with respect to the machine used by the hospital in testing. While Doctor Citron's general testimony was that there is no conversion factor for supernatant, if we were to use the figures set forth on Defendant's Exhibit 8 and apply those numbers to the .174 test result introduced as Commonwealth Exhibit 2, we would reach a conversion figure of .158.

N.T., 7/13/11, at 180. Having reviewed Exhibit 8 and the relevant testimony by Dr. Citron regarding that exhibit, I cannot agree that his testimony, even when viewed in a light most favorable to the Commonwealth, establishes a conversion factor applicable to Appellant's BAC test.

5. The Commonwealth, in its brief, incorrectly refers to the verdict in this matter as a jury verdict.

A review of the relevant questions and testimony pertinent to the majority's finding relative to Dr. Citron's alleged presentation of a conversion factor is warranted. However, by way of background, I note that Exhibit 8 is merely a graphic chart drawn by defense counsel during his examination of Dr. Citron. The chart drawn by counsel was in reference to another defense exhibit, Exhibit 7. That exhibit pertains to an eighty-eight-person study apparently conducted by the makers of the Beckman Colter machine, which was the type of machine utilized herein, and compares gas chromatography whole blood testing to testing done with its machine. Exhibit 8 merely reiterates that the study showed a supernatant test on a Beckman Colter machine revealing an average BAC of .182% could be correlated with a gas chromatography whole blood test result of .166%.[6] The study bears no relationship to Appellant's testing aside from the fact that Appellant's supernatant BAC test was conducted on a Beckman Colter machine.

The majority's conclusion appears to be derived from the following testimony of Dr. Citron in regards to Exhibits 7 and 8:

the mean for the machine when they measured the blood alcohol concentration of these eighty-eight people came out to be .182 grams per deciliter. The gas chromatography with those same people was lower because the machine measures supernatant serum and plasma and the gas chromatography measures whole blood. So, with that, they established a conversion factor and they also say that within the graph or this group of eighty-eight people comparing that curve or bell-shaped curve or slope the correlation between those two is very high .997, almost one. So, they can

take this data and say our machine is accurate, but it's accurate in terms of what we measure. We measured serum, plasma, or a partial. We're not measuring whole blood. When you do, we have a good correlation to the gold standard. That's what's [sic] their analysis did.

Defense Counsel: But does the correlation mean no conversion is necessary from supernatant to whole blood?

[Commonwealth objection overruled]

Dr. Citron: No. Just looking at this, you could do a calculation and come up with what **their conversion factor is.** There has to be a conversion factor because one machine got 182 and [the] other method got 166 with the same specimen from the same person. It's a lower number. You have the enzyme method by the hospital lab 182 where you're measuring smaller volume that you have taken the cellular material out of. Your conversion factor there is a little bit less than ten percent conversion factor.

Defense Counsel: But that's just the mean?

Dr. Citron: Yes.

*Id.* at 133–134 (emphasis added). Later, counsel, while drawing Exhibit 8, asked and Dr. Citron answered,

Defense Counsel: This difference or the mean indicates there's a need to convert supernatant to whole blood because in the supernatant sample you take out all the solids; in the gas chromatography samples, you don't.

Dr. Citron: That's correct.

*Id.* at 135.

The trial court subsequently questioned Dr. Citron with respect to Exhibit 8.

---

**6.** Here, the trial court took this study's conversion rate of .91 and concluded that this was an appropriate conversion factor in this

matter and multiplied that by Appellant's supernatant BAC test result of .174%.

Court: On the chart that [counsel] put up, which is Defendant's Exhibit No. 8, the numbers that he was looking at were kind of remarkably similar to the numbers that we have in this case here today, at least the one, and that was supernatant of .182 and I wasn't sure exactly where the number came from but I thought you were suggesting that a conversion of the 182 supernatant result was 166 gas whole blood result; is that correct?

Dr. Citron: Yes, according to the—where it's coming from was from the—

Court: According to the information you have relied on in giving your testimony today, correct?

Dr. Citron: Only in terms of the relationship or the accuracy of the machine. What they did was they took serum and put ethanol in it or gave people ethanol. That's why I'm saying these are—its states four to five of these are specimens that are known to contain ethanol whereas when you get a specimen in a laboratory, you don't know that it's a specific ethanol only and that's where these numbers come from.

Court: If I were to accept the fact that there were supernatant results of 181 from the Lock Haven Hospital on this Defendant's blood, the conversion of that number to a gas test on whole blood would be 166, correct?

Dr. Citron: With this study. There have been other studies that have shown different relationships.

Court: With this machine based on that study. Dr. Citron: Yes, sir.

Court: But you're telling me that there are other studies, I believe that go from eight to forty-nine percent or something like that?

Dr. Citron: Yes, sir.

Court: Is forty-nine percent the highest?

Dr. Citron: That's been reported in the medical literature, yes, sir.

Court: And that's forty-nine percent of what; forty-nine percent difference.

Dr. Citron: Yes.

Court: So that no matter what if it were a supernatant of even 174, no matter how much of a conversion it would be, it still would be above a .10; is that right?

Dr. Citron: On the premise that the 184 was only ethanol, yes.

Court: Let's assume that it was 174, which is the lowest number we have here.

Dr. Citron: **Again, what you don't have is you don't have any measurements by the hospital to include or discount the potential bias forming elements or contaminants. Had they done a lactic acid level at the same time that they did the ethanol, because lactic acid is the most common form of contaminants—**

Court: But do you agree that the blood level under any testing would be .10 or above—at least .10 on this Defendant on this particular day in this particular case?

Dr. Citron: **Not if the premise is that it's .10 ethanol, no, I do not agree. There's been nothing that's been presented to me to rule out anything that could falsely elevate that number that's not ethanol.**

*Id.* at 165–167 (emphases added).

Contrary to the majority, I do not read this testimony as Dr. Citron opining, "that supernatant results of .181% from the Lock Haven Hospital could be converted to a gas test on whole blood of .166%." Majority Opinion, at 11. Dr. Citron was not referring to the Lock Haven Hospital testing, but a study on a brand of machine used by the hospital. He specifically rejected the premise that the Lock Haven

Hospital test results could be converted in the manner prescribed by the majority. This is precisely why he did not give a definitive percentage in discussing the trial court's question of a conversion from .174%. *See id.* Pointedly, Dr. Citron stated, "you can't transfer this study to that type of environment." N.T., 7/13/11, at 168. He added that there was no scientifically-established conversion range for the method used by Lock Haven Hospital and that it would be speculative to determine a whole blood BAC in this case based on the test performed by the hospital. *Id.* at 169. Ultimately, he stated that no conversion was done in this case. *Id.* at 171.

Instantly, there was no evidence presented of a scientifically-accepted conversion factor used by Lock Haven Hospital, nor was evidence presented that Lock Haven Hospital follows a standard policy or procedure for converting supernatant blood test results to whole blood results. *Compare Commonwealth v. Michuck*, 454 Pa.Super. 594, 686 A.2d 403, 406–407 (1996). Accordingly, I am not persuaded by the majority's expression of rationale and believe its reliance on Dr. Citron's testimony as providing a basis for a conversion factor in this case is untenable. For these reasons, I respectfully dissent.