COMMONWEALTH of Pennsylvania, Appellee

v.

Charles KARNS, Appellant.

Superior Court of Pennsylvania.

Argued March 27, 2012.
Filed July 27, 2012.

Joshua Auriemma, Harrisburg, for appellant.

William J. Higgins, Jr., Assistant District Attorney, Bedford, for Commonwealth, appellee.

BEFORE: DONOHUE, LAZARUS and OTT, JJ.

OPINION BY DONOHUE, J.:

Charles Karns ("Karns") appeals from the judgment of sentence entered on February 15, 2011, by the Court of Common Pleas, Bedford County, following his convictions of two counts of Driving Under the Influence ("DUI")—general impairment and DUI—highest rate of alcohol.[1] After careful review, we vacate the judgment of sentence for DUI—highest rate of alcohol and remand for resentencing.

The events giving rise to this appeal began on the evening of April 9, 2009. That night, Officer Patterson of the Bedford Borough Police Department was on general patrol during the 11:00 p.m. to 7:00 a.m. shift. N.T., 10/27/2010, at 61. Officer Patterson received a report of a vehicle nearly hitting two women in the area of the PennWest Bar. *Id.* at 61–62. After speaking with the women regarding the incident and obtaining a description of the vehicle in question, Officer Patterson began to search for a large gold or tan Chevrolet SUV with mud and grass protruding from the undercarriage. *Id.* at 63–65. Officer Patterson found a vehicle matching this description parked near a bar located within three to four blocks of where the women reported last seeing the vehicle. *Id.* at 64–65. Officer Patterson turned his vehicle around and saw a man, later identified as Karns, get into the vehicle and drive away. *Id.* at 65–66.

Officer Patterson followed Karns and initiated a stop after observing Karns' failure to use his turn signal, followed by

---

1. 75 Pa.C.S.A § 3802(a)(1); 75 Pa.C.S.A. § 3802(c)

watching Karns' vehicle cross over the centerline twice within a short distance. *Id.* at 66. Officer Patterson approached the vehicle and noted the smell of alcohol emanating from within. *Id.* at 67. He also observed that Karns' eyes were bloodshot and his speech was slurred. *Id.* Officer Patterson instructed Karns to exit the vehicle to conduct field sobriety tests, which Karns failed. *Id.* 67–68. For these reasons, Officer Patterson concluded that Karns was intoxicated and unable to safely operate a motor vehicle. *Id.* at 71. Karns submitted to blood testing at UPMC Bedford Memorial Hospital, where his blood alcohol content ("BAC") was determined to be 189 mg/dl or .189%. *Id.* at 71–72, 170, 242.

During its case in chief, the Commonwealth called the following witnesses: Officer Patterson; Harry Evans, the laboratory phlebotomist who drew the blood sample from Karns at UPMC Bedford Memorial Hospital; and Christine Ickes ("Ickes"), the medical lab scientist at UPMC Bedford Memorial Hospital who prepared and analyzed Karns' blood sample. *Id.* at 42, 25; 60–61, 66; 164, 168. At the conclusion of the Commonwealth's evidence, Karns moved for a judgment of acquittal on both counts of DUI, which the trial court denied. *Id.* at 262. Karns then presented the testimony of Dr. Joseph Citron, an expert in analytical chemistry and toxicology as well as standardized field sobriety testing. *Id.* at 285–86.

At the conclusion of the non-jury trial, the trial court found Karns guilty of the above referenced crimes and imposed a sentence of six to twenty-three and one half months of imprisonment in the Bedford County Jail for his conviction of DUI—highest rate of alcohol. The trial court found that the conviction for DUI—general impairment merged with the DUI—highest rate of alcohol conviction for sentencing purposes. Judgment of Sentence, 2/15/2011. Karns filed a post-sentence motion, which the trial court denied on June 27, 2011. Karns thereafter filed a timely notice of appeal followed by a Rule 1925(b) statement.

On appeal, Karns raises the following three issues for our review:

[1]. When testing non whole blood, the Commonwealth must present evidence that a conversion factor accepted by the scientific community was used. The Commonwealth did not present any evidence whatsoever that a conversion factor relied upon by the scientific community was used. Did the trial court commit an error of law in finding [Karns] guilty?

[2]. Exculpatory materials must be turned over to the defendant even when they are potentially inadmissible. The District Attorney knew that the hospital that tested [Karns'] blood was changing its alcohol blood testing procedures following [Karns'] alcohol blood test, but elected not to disclose that information to [Karns]. Did the Commonwealth violate the *Brady* rule?

[3]. Where a defendant meets the statutory eligibility requirements for the Intermediate Punishment Program ['IPP'], a county cannot condition acceptance upon additional eligibility requirements. The trial court made a finding of fact that [Karns] met the statutory eligibility requirements, but denied him pursuant to county requirements. Did the trial court err?

Appellant's Brief at 1.[2]

In his first issue on appeal, Karns challenges the sufficiency of the evidence presented by the Commonwealth to sustain

---

2. We have re-ordered Karns' issues for the ease of disposition.

his conviction for DUI—highest rate of alcohol. When reviewing a sufficiency of the evidence claim, our standard of review is as follows:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. LaBenne,* 21 A.3d 1287, 1289 (Pa.Super.2011).

To be convicted of DUI—highest rate of alcohol,[3] an individual's BAC must be .16% or higher. *See* 75 Pa.C.S.A. § 3802(c). Here, Ickes testified to a BAC of .189%, but Karns contends her testimony was insufficient as a matter of law because the Commonwealth failed to produce evidence of a conversion factor that is generally accepted in the scientific community. Appellant's Brief at 32.

With respect to the BAC requirements, this Court recently stated:

> The general rule for alcohol related DUIs is that only tests performed on whole blood will sustain a conviction under Section 3802. Thus, evidence of blood serum, plasma or supernatant[4] testing, without conversion, will not suffice. *See e.g., Commonwealth v. Renninger,* [452 Pa.Super. 421] 682 A.2d 356 (Pa.Super.1996); *Commonwealth v. Michuck,* [454 Pa.Super. 594] 686 A.2d 403 (Pa.Super.1996); [*Commonwealth v. Wanner,* 413 Pa.Super. 442, 605 A.2d 805, 808 (1992) ]; *Commonwealth v. Bartolacci,* [409 Pa.Super. 456] 598 A.2d 287 (Pa.Super.1991). The reasoning for this rule rests on the distinction between whole blood and blood serum:
>
> > The distinction between whole blood and blood serum is significant. Serum is acquired after a whole blood sample is centrifuged, which separates the [ ] blood cells and fibrin, the

---

3. Section 3802(c) provides:

   **§ 3802. Driving under influence of alcohol or controlled substance**

   \* \* \*

   (c) **Highest rate of alcohol.**—An individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the alcohol concentration in the individual's blood or breath is 0.16% or higher within two hours after the individual has driven, operated or been in actual physical control of the movement of the vehicle.

   75 Pa.C.S.A. § 3802(c).

4. In *Renninger,* this Court defined supernatant as "the usu[ally] clear liquid overlying material deposited by settling, precipitation, or centrifugation." *Renninger,* 682 A.2d at 362 n. 4 (citation omitted).

blood's clotting agent, from the plasma-the clear liquid i[n] the blood serum. When blood serum is tested the results will show a blood alcohol content which can range from between 10 to 20 percent higher than a test performed on whole blood. The reason for this is because the denser components of whole blood, the fibrin and corpuscles, have been separated and removed from the whole blood, leaving the less dense serum upon which the alcohol level test is performed. The value of the blood alcohol content in the serum is then determined. Because the serum is less dense than whole blood, the weight per volume of the alcohol in the serum will be greater than the weight per volume in the whole blood. Thus, an appropriate conversion factor is required to calculate the corresponding alcohol content in the original whole blood sample. *Michuck*, 686 A.2d at 405–406 (internal citations [and footnotes] omitted).

*Commonwealth v. Hutchins*, 42 A.3d 302, 309–10 (Pa.Super.2012) (footnote added).

In his appellate brief, Karns argues that because his BAC result was based upon testing supernatant, the Commonwealth was required to present evidence of a conversion factor that is reliable in the scientific community. *Id.* at 30–31 (citing *Commonwealth v. Kohlie*, 811 A.2d 1010, 1015 (Pa.Super.2002)). Karns contends that the Commonwealth failed to do so, as Ickes, the medical lab scientist that prepared and analyzed Karns' blood sample, failed to offer testimony sufficient to satisfy the Commonwealth's burden of proof. We agree.

In *Renninger*, this Court held that blood testing performed on supernatant, like blood testing performed on plasma and serum, requires conversion evidence that establishes whole blood alcohol content. *Renninger*, 452 Pa.Super. 421, 682 A.2d 356, 362 (1996). With respect to conversion evidence, this Court has required evidence of a conversion factor[5] to calculate the whole blood alcohol content of the original whole blood sample from the non-whole blood result. *Commonwealth v. Newsome*, 787 A.2d 1045, 1049 (Pa.Super.2001). "The Commonwealth may apply different conversion factors in different cases, as long as they are generally accepted within the scientific community." *Kohlie*, 811 A.2d at 1015.

In *Newsome*, for example, we held that the Commonwealth's evidence was sufficient to sustain the appellant's DUI conviction where the Commonwealth introduced the testimony of a lab manager and an expert in toxicology. *Newsome*, 787 A.2d at 1049. The lab manager testified that in converting the result to a whole blood BAC, she relied on conversion factors (1.10 and 1.35) identified in studies on converting serum to whole blood levels. *Id.*, 787 at 1046–47. The expert testified that the conversion factors were widely accepted in the field of toxicology. *Id.* at 1047. In *Michuck*, this Court found similar testimony from a lab technician and lab director, regarding a conversion factor of 1.18, to be sufficient. *Michuck*, 686 A.2d at 406–07. The lab technician testified that 1.18 was an average within an acceptable range and used in reputable medical literature. *Id.* at 406. The lab director also testified that the conversion factor of 1.18 was generally

5. A conversion factor "represents a statistical norm or average derived from a group study.... The establishment of a conversion factor involves a certain degree of variance due to the differing ratios between serum and whole blood found within the public at large." *Newsome*, 787 A.2d at 1049.

accepted within the scientific community. *Id.*

■ In the instant case, Ickes testified that she prepared and analyzed Karns' blood sample for BAC analysis. Specifically, Ickes reduced the whole blood sample to supernatant and placed it into a machine for analysis. *Id.* at 165–66, 205, 207. With respect to her testimony relating to a conversion factor, the Commonwealth questioned Ickes as follows:

Q. Does the machine convert the result to a whole blood test result?

A. Yes.

Q. All right. And ultimately what you get is a result. Is that representative of the person's blood alcohol content in whole blood?

A. We run it in duplicate. And then we, we take both results. We add them, and we divide by two, and we multiple it by three. That will give you the result.

Q. Okay. Why are you multiplying by three?

A. I'm,—

Q. Well, ultimately when you do that, when you do that analysis what is the end result? What is the end result you're getting? What is the, in what terms is your answer going to be?

A. It's going to be in milligrams per deciliters.

Q. Of what?

A. Of whole blood.

N.T., 10/27/2010, at 167–68.

When questioned by counsel for Karns, Ickes testified regarding a conversion factor as follows:

Q. In terms of particular with respect to a conversion ratio and your opinion as to whether or not it's whole blood or ultra filtrate or whatever you call it you don't have a—well, let's stick to the conversion factor. It is your testimony that there was a conversion factor that was used in this case?

A. Yes.

Q. Okay. In terms of the conversion factor that you believed was used in this case your basis of knowledge is what?

A. I can't answer that question.

The Court: Do you understand the question?

A. No, I don't.

Q. Okay. Let me ask it again. You've testified here that there's a conversion factor that the machine uses to get to whole blood. That's what you told us earlier.

A. Right. Right. Right.

Q. Okay. The source of that conversion factor. Can you provide that to us?

A. No, I can't.

*Id.* at 178–79.

Ickes also testified that the calculations she performed on the raw test results was not a computation to convert results (adding them together, dividing by two, then multiplying by three) from supernatant to whole blood. *Id.* at 238–39. Karns' attorney questioned Ickes as follows:

Q. In your direct test—in your direct testimony you said that the machine converts that which you tested into the ultimate result that you reported here of 189; correct?

A. Yes.

Q. And the process that we underwent to get to the 189 that is seen by way of example of exhibit—oh, is included in Exhibit Number 7 and Number 7 alone; correct?

A. Yes.

Q. That's a mathematical process that you used in order to come to that; correct?

A. Yes.

Q. Just to be clear what you did is you took the result form the top ticket which is 63.5. You added it to the bottom ticket result which was 62., I'm sorry. Strike that. You took the bottom ticket of 63.5, added it to the top ticket of 62.7. That resulted in 126.2; —

A. Yes.

\*   \*   \*

Q. You divided that by two to gain an average that you reported as 63.1; correct?

A. Yes.

Q. As far as that line is concerned on this particular exhibit you did no computation to convert it to whole blood; did you? You just did a straight average; correct?

A. Yes.

Q. Okay. The next line that's here the 63.1(3) equals 189. That is simply taking that previously gained average in the previous line, multiplying it by three which would be the correction factor for the dilution and the dilution alone; correct?

A. Yes.

Q. Again on this line that arrives at the ultimate result that you report of 189 there is no computation in there that does any sort of mathematical correction between the supernate [6] to whole blood, is there? You just simply multiplied your average by three; correct?

A. Yes.

*Id.* at 237–39 (footnote added). On redirect, Ickes testified to the following:

Q. All right. You multiplied the read-out by the dilution factor of three?

A. Yes.

Q. And did you then obtain a whole blood ethyl alcohol result on the dimension system?

A. Yes.

Q. And what was that .189 percent?

A. Yes.

Q. And used the factor of three to make that conversion?

A. Yes.

*Id.* at 241–42. On recross, Karns' attorney further questioned Ickes regarding the dilution factor of three.

Q. Okay. The District Attorney had asked you questions about what the dilution factor is in which case you answered that the dilution factor while he was pointing to it was 62.7 and 63.5. that's not the dilution factor; is it? That the expression of the supernate test; correct?

A. Yes.

Q. Okay. The dilution factor is three; correct?

A. Yes.

*Id.* at 257.

Our review of Ickes' testimony leads us to conclude that the Commonwealth failed to present evidence of a conversion factor that is generally accepted in the scientific community. As described above, Ickes testified that the machine performs the conversion, that she did not know how the machine does the conversion, that the calculation performed on the raw results has nothing to do with conversion, and that three was a dilution factor unrelated to conversion. Ickes' testimony never clearly

---

**6.** Supernate is also referred to as supernatant. *See* Merriam–Webster Online Dictionary, http://www.merriam-webster.com/medical/supernate.

identified what conversion factor was used with respect to Karns' blood sample, or whether the conversion factor used was generally accepted in the scientific community. Thus, the evidence presented by the Commonwealth was insufficient, and Karns' conviction for DUI—highest rate of alcohol cannot stand.

Karns also challenges the weight of the evidence with respect to his conviction for DUI—general impairment.[7] When reviewing a weight of the evidence claim, our standard of review is well established:

> A claim alleging the verdict was against the weight of the evidence is addressed to the discretion of the trial court. Accordingly, an appellate court reviews the exercise of the trial court's discretion; it does not answer for itself whether the verdict was against the weight of the evidence. It is well settled that the [fact-finder] is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses, and a new trial based on a weight of the evidence claim is only warranted where the [factfinder's] verdict is so contrary to the evidence that it shocks one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion.

*Commonwealth v. Houser*, 610 Pa. 264, 276, 18 A.3d 1128, 1135–36 (2011) (internal citations and quotations omitted).

In his brief, Karns argues that a general impairment conviction based upon knowledge of an invalid BAC result is against the weight of the evidence. Appellant's Brief at 35–36. We disagree.

■ In order to obtain a conviction pursuant to Section 3801(a)(1),[8] the Commonwealth must prove "the accused was driving, operating, or in actual physical control of the movement of a vehicle during the time when he or she was rendered incapable of safely doing so due to the consumption of alcohol." *Commonwealth v. Segida*, 604 Pa. 103, 116, 985 A.2d 871, 879 (2009).

■ At trial, the Commonwealth presented the testimony of Officer Patterson, who testified to the following: Karns' vehicle drifted across the centerline on two occasions; after initiating a stop and approaching the vehicle, the odor of alcohol emanated from inside Karns' vehicle; and Karns' eyes appeared bloodshot and his speech slurred. N.T., 10/27/2010, at 66–67. With respect to field sobriety testing, Officer Patterson testified that Karns was able to perform the one-leg stand test only for a count of three and that Karns swayed back and forth, failed to walk in a straight line, and failed to connect his heels to his toes for the walk and turn test. *Id.* at 68. Based upon Officer Patterson's testimony, the verdict is supported by evidence of record and does not in any respect shock one's sense of justice. Thus, the trial court did not abuse its discretion, and Karns' weight of the evidence claim must fail.

---

7. We note that Karns properly preserved his challenge to the weight of the evidence by raising his claim before the trial court in an oral motion. *See* Pa.R.Crim.P. 607(A).

8. Section 3802(a)(1) states that "[a]n individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the individual is rendered incapable of safely driving, operating or being in actual physical control of the movement of the vehicle." 75 Pa.C.S.A. § 3802(a)(1).

In his second issue, Karns contends that the prosecution failed to disclose exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Appellant's Brief at 20. However, based upon our resolution of his first issue on appeal, we do not reach the merits of Karns' second claim.

■■■ Prior to addressing Karns' third issue, we must first determine if his claim is properly before us. The Commonwealth asserts that Karns' claim challenges the discretionary aspects of his sentence, and therefore, Karns' failure to comply with Pa.R.A.P. 2119(f)[9] bars his claim. Appellee's Brief at 5–6. The following principles are well established:

> Criminal defendants do not have the automatic right to challenge the discretionary aspects of their sentence. Rather, they must seek permission. Pa. R.A.P. 2119(f). If a defendant fails to include an issue in his Rule 2119(f) statement, and the Commonwealth objects, then the issue is waived and this Court may not review the claim.
>
> In contrast, a defendant need not include within his Rule 2119(f) statement any challenges to the legality of the sentence. A challenge to the legality of the sentence may be raised as a matter of right, is nonwaivable, and may be entertained so long as the reviewing court has jurisdiction.

*Commonwealth v. Robinson*, 931 A.2d 15, 19–20 (Pa.Super.2007) (internal citations omitted).

■■■ In his brief, Karns challenges the trial court's decision to deny his application for county IPP. Appellant's Brief at 25. Karns frames his issue as a challenge to the legality of his sentence alleging that because the trial court found that he met the statutory eligibility requirements set forth in 42 Pa.C.S.A. § 9804(b), the trial court was therefore required to accept Karns' application for county IPP. *Id.* at 26, 29. For the following reasons, we conclude that Karns' challenge is to the trial court's sentencing discretion and that the issue is waived.

With respect to county IPP, this Court has described its purpose as follows:

> Our General Assembly, in passing legislation enabling the creation of county intermediate punishment programs, intended to create a means of protecting society while at the same time promoting efficiency and economy in providing corrections services. 42 Pa.C.S. § 9803(1). Further, the legislature aimed '[t]o promote accountability of offenders to their local community.' 42 Pa.C.S. § 9803(2). The General Assembly also stated that the purpose behind the Act was to both 'fill gaps in local correctional systems and address local needs through expansion of punishment and services available to the court[,]' and 'provide opportunities for offenders who demonstrate special needs to receive services which enhance their ability to become contributing members of the community.' 42 Pa.C.S. § 9803(3)(4).

*Commonwealth v. Sarapa*, 13 A.3d 961, 964 (Pa.Super.2011). Section 9802, which

---

9. With respect to 2119(f) statements, this Court has stated:
   > It is well settled that 'when a challenge to the discretionary aspect of a sentence is raised, an appellant must provide a separate statement specifying where the sentence falls in the sentencing guidelines, what provision of the sentencing code has been violated, what fundamental norm the sentence violates, and the manner in which it violates the norm. Pa.R.A.P. 2119(f).
   > *Commonwealth v. Sarapa*, 13 A.3d 961, 962 (Pa.Super.2011) (citing *Commonwealth v. Crump*, 995 A.2d 1280, 1282 (Pa.Super.2010)).

contains the definition section of the County Intermediate Punishment Act,[10] specifically defines an eligible offender as follows:

'Eligible offender.' Subject to section 9721(a.1) (relating to sentencing generally), a person convicted of an offense who would otherwise be sentenced to a county correctional facility, who does not demonstrate a present or past pattern of violent behavior and who would otherwise be sentenced to partial confinement pursuant to section 9724 (relating to partial confinement) or total confinement pursuant to section 9725 (relating to total confinement). The term does not include an offender with a current conviction or a prior conviction within the past ten years for any of the following offenses:

18 Pa.C.S. § 2502 (relating to murder).

18 Pa.C.S. § 2503 (relating to voluntary manslaughter).

18 Pa.C.S. § 2702 (relating to aggravated assault). 18 Pa.C.S. § 2703 (relating to assault by prisoner).

18 Pa.C.S. § 2704 (relating to assault by life prisoner).

18 Pa.C.S. § 2901 (relating to kidnapping). 18 Pa.C.S. § 3121 (relating to rape).

18 Pa.C.S. § 3122.1 (relating to statutory sexual assault).

18 Pa.C.S. § 3123 (relating to involuntary deviate sexual intercourse).

18 Pa.C.S. § 3124.1 (relating to sexual assault).

18 Pa.C.S. § 3125 (relating to aggravated indecent assault).

18 Pa.C.S. § 3126 (relating to indecent assault).

18 Pa.C.S. § 3301 (relating to arson and related offenses).

18 Pa.C.S. § 3502 (relating to burglary) when graded as a felony of the first degree.

18 Pa.C.S. § 3701 (relating to robbery).

18 Pa.C.S. § 3923 (relating to theft by extortion).

18 Pa.C.S. § 4302 (relating to incest).

18 Pa.C.S. § 5121 (relating to escape).

42 Pa.C.S.A. § 9802. This Court has consistently held that once a trial court determines a defendant is an eligible offender, it is within the trial court's discretion to decide whether the defendant will be admitted into IPP. In *Commonwealth v. Williams*, 941 A.2d 14 (Pa.Super.2008), for example, we stated:

Pursuant to the relevant statutes, the court may consider only 'eligible offenders' for IPP sentencing. *Commonwealth v. Syno*, 791 A.2d 363, 366 (Pa.Super.2002) (citing 42 Pa.C.S.A. § 9804(b)(1)). [ . . . ] In adopting IPP as a sentencing alternative, '[t]he Legislature's intent was to give judges another sentencing option which would lie between probation and incarceration with respect to sentencing severity; to provide a more appropriate form of punishment/treatment for certain types of nonviolent offenders; to make the offender more accountable to the community; and to help reduce the county jail overcrowding problem while maintaining public safety.' [*Commonwealth v. Arthur Williams*, 868 A.2d 529], 534 [ (Pa.Super.2005), *appeal denied*, 586 Pa. 726, 890 A.2d 1059 (2005) ]. Thus, the grant or denial of a defendant's request for IPP is largely within the sound discretion of the trial court. *Syno, supra.*

*Williams*, 941 A.2d at 23–24 (emphasis in original). Likewise, in *Sarapa*, where we held that the County lacked the authority to redefine an "eligible offender" by bar-

---

**10.** 42 Pa.C.S.A. §§ 9801–9812.

ring an entire class of offenders from IPP, we noted the following:

> We write further, however, to note that our holding does not require, on remand, that the trial court sentence Appellant to an IPP sentence; rather, the sentencing court should carefully consider the relevant criteria for IPP, the circumstances of Appellant's case, and whether Appellant would benefit from an IPP sentence.

*Sarapa*, 13 A.3d at 968.

While Karns contends that the trial court was required to admit him to IPP because it determined that he was an eligible offender and there was no legitimate reason for his preclusion, we cannot agree. As noted above, the law is contrary to Karns' contention, *i.e.*, the trial court has discretion regarding whether or not an eligible offender is accepted into IPP. *See Williams*, 941 A.2d at 23–24; *Sarapa*, 13 A.3d at 968. Thus, Karns' sentencing claim does challenge the trial court's sentencing discretion, and he was required to include a Rule 2119(f) statement in his brief to this Court. Because Karns has failed to do so and the Commonwealth objected, we must find his discretionary sentencing claim waived.

Even if we were to review Karns' discretionary claim, we would still conclude that no relief is due. The trial court decided to deny Karns' application for IPP and expressed its reasoning as follows:

> During the interview with the Chief Probation Officer to review the program requirements, [Karns] expressed reservations about his willingness to cooperate with the program requirements; neither was [Karns] willing to provide the Probation Office with documentation of income to determine whether he qualified for the reduced costs schedule. Giving such a demonstration of unwillingness to comply with a number of the

program elements, the [trial c]ourt declined admission.

Trial Court Opinion, 6/27/2011, at 2. Based upon its reasoning above, we would find no abuse of discretion in the trial court's determination.

Judgment of sentence vacated with respect to the conviction for DUI—highest rate of alcohol. Case remanded for resentencing on the conviction for DUI—general impairment. Jurisdiction relinquished.