J-S06032-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ARTHUR HUMPHRIES | : | |
| | : | |
| Appellant | : | No. 2952 EDA 2022 |

Appeal from the Judgment of Sentence Entered November 4, 2022
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):  CP-51-CR-0002654-2020

BEFORE:  DUBOW, J., McLAUGHLIN, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:                    **FILED APRIL 12, 2024**

Arthur Humphries ("Humphries") appeals from the judgment of sentence imposed following his convictions for third-degree murder, possessing instruments of crime, two counts of violating the Uniform Firearms Act, and persons not to possess firearms.[1]  We affirm.

The trial court provided the following summary of the evidence:

> Tressa Lancaster testified that she was in a relationship with [Terrell Washington ("Washington")].  At the time of Washington's death, Lancaster lived with her daughter and Washington . . . in Philadelphia.  On May 31, 2020, Lancaster went to the lobby of her apartment building to receive a food delivery order.  In the lobby, Lancaster saw [Humphries], Diamond Knight ["Knight"], and Knight's mother.  Knight's mother got on the elevator, but [Humphries] and Knight did not. [Humphries] and Knight instead got on the elevator when Lancaster went back up to her apartment.  In the elevator, Knight asked Lancaster if she knew [Humphries].  [Humphries] did not say anything but laughed.  Lancaster testified that she had never spoken to Knight or

_____

[1] **See** 18 Pa.C.S.A. §§ 2502(c), 907, 6106, 6108, 6105.

[Humphries] before that date. Lancaster got off the elevator and walked up the steps to her apartment.

On June 1, 2020, Lancaster . . . went into the building's mailroom . . . . [Lancaster] was on a FaceTime with Washington, who was in their apartment. When Lancaster left the mailroom, [Humphries] and Knight were behind her. Knight asked Lancaster about their conversation the previous night . . . . The two women then began fighting in front of the elevators, causing Lancaster's phone to fall to the floor. Washington subsequently came down . . . to the lobby. [Humphries] walked over to Knight and Lancaster, who were still fighting, and touched Lancaster. In response, Washington moved [Humphries's] hand. [Humphries] then lifted his shirt up and Lancaster saw that [Humphries] had a silver gun.

Washington hit [Humphries] and the two started fighting. Lancaster then heard several gunshots go off. Because she could hear Washington asking for help, Lancaster ran up the stairs and knocked on her neighbor's door and asked for help. The neighbor called 9-1-1 while Lancaster returned to the lobby and found no one there other than Washington. Lancaster later gave a statement to detectives in which she identified [Humphries]. Lancaster also pointed [Humphries] out on the street while talking to a detective. [Humphries] then ran away and the police went looking for him.

Philadelphia Police Officer Ashley Krause testified that she was on duty with two . . . other officers on June 1, 2020, when they received a dispatch call . . . that two . . . women were fighting and that a man had been shot . . . . [O]fficer Krause went to [Washington's] apartment complex . . . . Officer Krause saw a man, later identified as [Washington], face down on the ground, saturated with blood, with his head toward the elevator. Officer Krause carried Washington to medics who had arrived at the apartment complex, then rode with him in an ambulance to Lankenau Hospital. In the ambulance, Officer Krause . . . searched Washington, finding no weapons on his person and only a cell phone in his left pocket.

Philadelphia Police Detective Frank Mullen testified that he prepared a compilation video with authenticated footage recovered from the apartment complex . . . . Detective Mullen narrated the compilation video as it was shown to the jury. Detective Mullen testified that the video showed a woman walking

- 2 -

into the main lobby of the apartment complex and then getting involved in a physical altercation. [Washington] could then be seen picking up a cell phone off the floor and putting it in his pocket. The two men in the video could then be seen talking to one another before also engaging in a physical altercation. Finally, the video showed [Humphries] shooting Washington multiple times, then walking away.

Tressa Lancaster was shown the compilation video during her testimony. She identified herself, [Washington], [Knight], and [Humphries] as the individuals seen in the video. Lancaster noted that [Humphries] was not present when the fight between her and Knight began, but that he later entered the building while carrying bags. Lancaster also testified that Washington picked up her phone when he came to the ground floor. Lancaster further described the events depicted in the video, identifying when she told Washington to get Knight off her hair. At this point, [Humphries] came over and touched Lancaster's back. Washington then smacked [Humphries's] hand down and [Humphries] lifted his shirt up.

Philadelphia Police Detective Robert Conway testified that he was the assigned detective for the shooting . . .. Detective Conway went to the apartment lobby that day, where he took photographs . . . recovered seven cartridge casings, four bullet fragments, and one projectile. Once [Washington] was declared dead . . . the case was transferred to the [H]omicide [U]nit. Philadelphia Police Officer Lawrence Flagler, who was assigned to the Firearms Identification Unit, testified as an expert in the field of firearms and tool mark examination.

Officer Flagler testified that he was able to conclude that the seven cartridge casings all originated from the same firearm and that two of the bullet jacket fragments also originated from the same firearm.

Dr. Khalil Wardak, a medical examiner in the Philadelphia Medical Examiner's Office, testified that he performed an autopsy of [Washington] . . .. Dr. Wardak found that Washington's cause of death was multiple gunshot wounds, and the manner of his death was homicide. Dr. Wardak determined that there were six gunshot wounds to Washington's body. As a result of these gunshots, Washington suffered injuries to his liver, stomach, pancreas, clavicle, left lung, diaphragm, left arm, right arm, and

left thigh. Dr. Wardak determined that three of the gunshots were to the torso and three were to the limbs and concluded that the gunshots to the torso were fatal. Dr. Wardak was unable to determine the order in which the gunshots were fired.

Dr. Wardak . . . explained that when someone is punched in the head with significant force, their brain hits the interior of the skull, which can injure the brain. This can also result in disorientation and affect the individual's thought processes. Dr. Wardak testified that he watched the video of Washington punching [Humphries] and observed that the punch was not effective to cause [Humphries] to fall or render him unconscious. Additionally, Dr. Wardak did not observe any physical injuries on [Humphries'] face, such as laceration or tearing of the skin, after he was struck. Dr. Wardak noted that he did not himself examine or question [Humphries] after he was punched.

Philadelphia Police Detective James Burke testified that he . . . . was unable to locate Knight after traveling to four different addresses on five different occasions. Furthermore, Detective Burke never became aware of her whereabouts.

Philadelphia Police Detective Timothy Bass, who was assigned to the fugitive squad, testified that he was tasked with locating [Humphries]. . .. On June 19, 2020, Detective Bass went to the residence of Michelle Hill, where he finally located [Humphries] . . . and arrested him.

＊ ＊ ＊ ＊ ＊

There was a stipulation between the Commonwealth and [Humphries's] counsel that [Humphries] did not have a license to carry a firearm on June 1, 2020. There was also a stipulation between the Commonwealth and [Humphries's] counsel regarding a certificate of non-licensure for [Humphries].

*See* Trial Court Opinion, 5/22/23, at 1-7 (record citations and numerals omitted).

In May 2022, the jury convicted Humphries of the above-listed offenses. The trial court then convicted him of persons not to possess firearms. In

November 2022, the court sentenced Humphries, who had a prior record score of "5," to an aggregate term of imprisonment of twenty-five to fifty years. Humphries filed a timely post-sentence motion which the trial court denied. Humphries appealed, and he and the trial court complied with Pa.R.A.P. 1925.

On appeal, Humphries raises the following issues for our review:

I. Whether [Humphries's] conviction for murder was based upon insufficient evidence where the Commonwealth did not prove beyond a reasonable doubt that [Humphries] possessed the necessary malice for murder?

II. Whether [Humphries's] conviction for murder was against the weight of the evidence and shock's one's sense of justice where [Washington] attacked [Humphries], striking him in the head repeatedly with fists, and where [Humphries] was dazed and acted out of fear and rage and the mistaken belief that he was justified in using lethal force?

III. Whether the court abused its discretion at sentencing:

(a) Where it imposed a consecutive term of imprisonment where there were mitigating circumstances and the imposition . . . a consecutive sentence presents a substantial question that the sentence is inappropriate because it is contrary to the norms underlying the Sentencing Code, and

(b) Where the court imposed the maximum sentence permitted for third degree murder because of the existence of mitigation and provocation by [Washington] warranted a sentence below the maximum sentence of 20-40 years for murder and the imposition of a maximum sentence is excessive and presents a substantial question that the sentence is inappropriate because it is contrary to the norms underlying the sentencing code?

Humphries's Brief at 6 (issue reordered, unnecessary capitalization omitted).

Humphries's first issue implicates the sufficiency of the evidence of third-degree murder.

This Court reviews the sufficiency of the evidence under the following standard:

> A claim challenging the sufficiency of the evidence is a question of law.  Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. . .. ***When reviewing a sufficiency claim[,] the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.***

***Commonwealth v. Stahl***, 175 A.3d 301, 303-04 (Pa. Super. 2017) (some emphasis removed).  In reviewing a sufficiency claim, this Court will not:

> weigh the evidence and substitute our judgment for the fact-[]finder . . ..  The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.  Moreover, in applying the above test, the entire record must be evaluated[,] and all evidence actually received must be considered.  Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. Antidormi***, 84 A.3d 736, 756 (Pa. Super. 2014) (citation omitted).  A reviewing court "evaluate[s] the entire trial record and all evidence actually received, in the aggregate and not as fragments isolated from the totality of the evidence." ***Commonwealth v. Nixon***, 801 A.2d 1241, 1243 (Pa. Super. 2002).

To convict a defendant of third-degree murder, the Commonwealth must show he committed the killing with "malice aforethought," *i.e.*, "a class of wanton and reckless conduct [that] manifests . . . an extreme indifference to the value of human life but does not necessarily . . . an intent to kill." ***Commonwealth v. Santos***, 876 A.2d 360, 364 (Pa. 2005). ***See Commonwealth v. Ludwig***, 874 A.2d 623, 632 (Pa. 2005) (stating "malice" includes evidence of particular ill-will, a wickedness of disposition, hardness of heart, recklessness of consequences, and a mind regardless of social duty); ***Commonwealth v. Fisher***, 80 A.3d 1196, 1191 (Pa. 2013) (holding malice can be inferred and found from the attending circumstances, even without the intent to cause death).

Humphries asserts he reacted to unwarranted provocation and was disoriented and not thinking clearly when he repeatedly shot Washington. He also claims he believed he faced imminent death or serious bodily injury. ***See*** Humphries's Brief at 17-19.

The trial court found Humphries's initiation of a confrontation with Washington by displaying his gun, his firing of multiple shots, three of which struck Washington's torso, even after Washington crawled away, and medical evidence undermining Humphries's assertion of disorientation sufficient to prove malice and third-degree murder. ***See*** Trial Court Opinion, 5/22/23, at 9-12.

The trial court did not err. Humphries's act of shooting Washington three times in the torso and three additional times manifested extreme indifference to human life, "recklessness of consequences, and a mind regardless of social duty." *Santos*, 876 A.2d at 364; *Ludwig*, 874 A.2d at 632. Moreover, the Commonwealth presented evidence discrediting Humphries's assertion that disorientation caused his actions. Thus, the claim merits no relief.

Humphries's second issue implicates the weight of the evidence.

When reviewing a challenge to the weight of the evidence, this Court's standard of review is as follows:

> The essence of appellate review for a weight claim appears to lie in ensuring that the trial court's decision has record support. Where the record adequately supports the trial court, the trial court has acted within the limits of its discretion.
>
> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding the facts, certain facts are so clearly of greater weight that to ignore them or give them equal weight with all the facts is to deny justice.
>
> An appellate court's standard of review when presented with a weight of the evidence challenge is distinct from the standard of review applied by the trial court. Appellate review of a weight claim is a review of the exercise of discretion, not the underlying question of whether the verdict is against the weight of the evidence.

*Commonwealth v. Muci*, 143 A.3d 399, 410-11 (Pa. Super. 2016) (citation omitted). To prevail on a weight challenge, a defendant must prove the

evidence is "so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *See Commonwealth v. Sullivan*, 820 A.2d 795, 806 (Pa. Super. 2003).

Humphries contends the verdict was against the weight of the evidence because he was an innocent bystander to the original violence, brandished his weapon only in warning, had his rational thought process interrupted by Washington's repeated punches, and believed Washington had murderous intent. *See* Humphries's Brief at 15-16.

The trial court found the jury's verdict did not shock the court's conscience. It noted Washington was unarmed, his punch lacked the power to cause Humphries to fall or lose consciousness, and Humphries continued to shoot Washington even as he crawled away. *See* Trial Court Opinion, 5/22/23, at 14-15.

We perceive no abuse of discretion in the trial court's determination. The jury saw video evidence and heard direct testimony establishing Humphries escalated a confrontation by displaying a gun and, after Washington punched him, shot Washington seven times even as Washington crawled away, wounded, and further, that Washington's punch had not been forceful enough to alter Humphries's consciousness. Humphries thus fails to demonstrate the trial court abused its discretion by denying his weight claims. *See Muci*, 143 A.3d at 410-11; *Sullivan*, 820 A.2d at 806 (Pa. Super. 2003).

Humphries's final two issues implicate the discretionary aspects of sentence.

A discretionary aspects of sentence claim is not appealable as of right; an appellant must invoke this Court's jurisdiction by satisfying a four-part test. This Court must determine:

(1) whether appellant has filed a timely notice of appeal, **see** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, **see** Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, [**see**] Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, [**see**] 42 Pa.C.S.A. § 9781(b).

**Commonwealth v. Moury**, 992 A.2d 162, 170 (Pa. Super. 2010) (internal citations and brackets omitted). A defendant waives any claim he fails to include in his Rule 2119(f) statement. **See Commonwealth v. Karns**, 50 A.3d 158, 166 (Pa. Super. 2012).

Although Humphries's statement of questions presented lists two sentencing claims, he asserts only one: his sentence is manifestly unreasonable, and the court failed to give proper weight to mitigating factors. That claim has been held to present a substantial question. **See Commonwealth v. Pisarchuk**, 306 A.3d 872, 879 (Pa. Super. 2023). We

therefore grant review of the discretionary aspects of Humphries's sentence on its merits.[2]

Humphries contends the court failed to weigh the provocation he faced and his difficult childhood, including childhood abuse, foster care, and DHS supervision. *See* Humphries's Brief at 20-21.

Our standard of review for a challenge to the discretionary aspects of a sentence is as follows:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

***Commonwealth v. Garcia-Rivera***, 983 A.2d 777, 780 (Pa. Super. 2019) (internal citations omitted).

A court must state on the record at sentencing the reasons for the sentence it imposes. *See **Commonwealth v. Mouzon***, 812 A.2d 617, 620-21 (Pa. 2002). The court satisfies that requirement by stating it has been informed by the post-sentence investigation report ("PSI"). ***See***

_____

[2] We do not, however, review Humphries's stated question that the court erred in imposing consecutive sentences because he did not assert that claim in his Rule 2119(f) statement, ***see Karns***, 50 A.3d at 166, and does not address that claim in his argument, ***Commonwealth v. Fletcher***, 986 A.2d 759, 785 (Pa. 2009). Furthermore, a challenge to the imposition of consecutive sentences does not raise a substantial question, ***see Commonwealth v. Raven***, 97 A.3d 1244, 1253 (Pa. Super. 2014).

- 11 -

*Commonwealth v. Miller*, 275 A.3d 530, 536 (Pa. Super. 2022). An appellate court accords great deference to the sentencing court's determination because the trial court is in the best position to assess a defendant's character, display of remorse, and the overall effect and nature of the crime. *See Commonwealth v. Salter*, 290 A.3d 741, 749 (Pa. Super. 2023).

At both the sentencing hearing and in its Opinion, the court stated it considered the presentence report, the sentencing guidelines, the sentencing code, the facts and circumstances of the case, Humphries's prior record, and his mental health evaluation. *See* N.T., 11/4/22, at 12-14; Trial Court Opinion, 5/22/23, at 19-20. The court explained it based its sentence on Humphries's escalation of a fist fight and his shooting of Washington multiple times as he crawled away, under circumstances that would have supported a conviction of first-degree murder. *See* N.T., 11/4/22, at 12-13.

The record demonstrates the trial court examined the PSI, creating the inference it considered the proper sentencing factors, including the mitigating factors Humphries asserts. *See Miller*, 275 A.3d at 536. That the court did not assign the weight to the mitigating factors Humphries believes appropriate does not establish the court did not consider them. Humphries has not proved the trial court abused its discretion in sentencing. *See Salter*, 290 A.3d at 749.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler

Benjamin D. Kohler, Esq.
Prothonotary


Date:  4/12/2024