J-S63035-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| LLOYD L. BUTLER, | : | |
| | : | |
| Appellant | : | No. 885 EDA 2014 |

Appeal from the Judgment of Sentence entered on February 7, 2014
in the Court of Common Pleas of Philadelphia County,
Criminal Division, No(s): CP-51-CR-0009687-2012;
CP-51-CR-0009689-2012

BEFORE: DONOHUE, MUNDY and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:                    **FILED NOVEMBER 12, 2015**

Lloyd L. Butler[1] ("Butler") appeals from the judgment of sentence

imposed following his convictions of two counts of murder in the first degree

and one count of possession of an instrument of crime ("PIC"). **See** 18

Pa.C.S.A. §§ 2502(a), 907(a). We affirm.

The trial court set forth the relevant underlying factual and procedural

history in its Opinion, which we adopt for the purpose of this appeal. **See**

Trial Court Opinion, 5/15/14, at 1-9.[2]

On appeal, Butler raises the following questions for our review:

---

[1] Lloyd Butler is also known as Christopher Lloyd Butler.

[2] Butler was tried with codefendant, Zaiee Talbert ("Talbert"). The trial
ended with a hung jury as to Talbert's charges. However, Talbert was
subsequently tried separately and was convicted of two counts each of
murder in the first degree and criminal conspiracy. Talbert has appealed his
judgment of sentence at 719 EDA 2015.

1.    Whether the verdict was against the sufficiency of the evidence, when [Butler's] cell phone and cell phone tower records demonstrated that he was not involved in the shooting[?]

2.    Whether the verdict was against the weight of the evidence, when [Butler's] cell phone and cell phone tower records demonstrated that he was not involved in the shooting[?]

Brief for Appellant at 4.

In his first claim, Butler argues the evidence was insufficient to support his convictions because there was no physical evidence tying him to the homicides.  *Id.* at 11.  He contends that his cell phone and cell phone tower records establish that he was on the phone with his girlfriend from the time prior to shooting, during the relevant time of the shooting, and after the shooting.  *Id.*  Butler argues he could not possibly have been shooting guns while talking on his cell phone at the same time, without the other person on the line hearing gunshots.  *Id.*  He asserts that his girlfriend testified she did not hear any gunshots while on the phone with Butler.  *Id.*  Butler claims that the cell phone records show that the phone conversation lasted for twenty-two minutes and thirty-seven seconds.  *Id.*

Here, the trial court set forth the relevant law and determined that the claim is without merit.  **See** Trial Court Opinion, 5/15/14, at 12-13.[3]  The

_____

[3] Butler does not specifically challenge his conviction of possessing an instrument of crime.  However, after a review of the record, we conclude that the evidence is sufficient to sustain this conviction.  **See** Trial Court Opinion, 5/15/14, at 2-9, 13; **see also** 18 Pa.C.S.A. § 907(a) (stating "[a] person commits a misdemeanor of the first degree if he possesses any instrument of crime with intent to employ it criminally).

jury was free to disbelieve Butler and his girlfriend's testimony that they were talking on their cell phones at the time of the murders. *See Commonwealth v. Melvin*, 103 A.3d 1, 40 (Pa. Super. 2014) (stating that the fact-finder is free to believe all, part, or none of the testimony presented). Thus, for this claim we adopt the sound reasoning of the trial court for the purpose of this appeal, and conclude that its findings are supported by competent evidence, and its legal conclusions are sound. *See* Trial Court Opinion, 5/15/14, at 12-13; *see also Melvin*, 103 A.3d at 40.

In his second claim, Butler argues this case should shock the conscience of the court because the verdict is contrary to the weight of the evidence. Brief for Appellant at 12. Butler contends he was found guilty for a crime which he has always claimed he did not commit. *Id.* Butler reiterates, in his second claim, that there is no physical evidence connecting him to the homicides. *Id.* He claims that eyewitness Lydia Morales ("Morales") stated to the police, and later recanted at trial, that she saw Butler standing over the victim, Jonathan Stokely ("Stokely"), and shooting him with a machine gun, and then saw Butler fleeing the scene in a purple van immediately afterwards. *Id.* Butler asserts Morales is mistaken because Butler's cell phone and cell phone tower records demonstrate that he remained in the area for two hours after the incident, and then went in a northeast direction. *Id.* Butler contests that, in contrast, the assailants in the purple van left the scene immediately after the shooting, and cell phone

- 3 -

and cell phone tower records indicated that the van went in a southwest direction. *Id.*

We apply the following standard of review for challenges to the weight of the evidence:

> A claim alleging the verdict was against the weight of the evidence is addressed to the discretion of the trial court. Accordingly, an appellate court reviews the exercise of the trial court's discretion; it does not answer for itself whether the verdict was against the weight of the evidence. It is well[-] settled that the fact-finder is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses, and a new trial based on a weight of the evidence claim is only warranted where the fact-finder's verdict is so contrary to the evidence that it shocks one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion.

*Commonwealth v. Karns*, 50 A.3d 158, 165 (Pa. Super. 2012) (citation and brackets omitted).

Here, the trial court set forth the relevant law, and determined that Butler's claim is without merit. *See* Trial Court Opinion, 5/15/14, at 13-15. We adopt the sound reasoning of the trial court for the purpose of this appeal, and conclude that the trial court did not abuse its discretion in denying Butler's weight of the evidence claim. *See id.*; *see also Karns*, 50 A.3d at 165.

Judgment of sentence affirmed.

J-S63035-15

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/12/2015

- 5 -

**IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA

v.

LLOYD BUTLER

: CP-51-CR-0009687-2012
: CP-51-CR-0009689-2012
:
:
:
:
: 885 EDA 2014
:
:
:
:
:
:
:

FILED

MAY 1 5 2014

Criminal Appeals Unit
First Judicial District of PA

OPINION



CP-51-CR-0009687-2012 Comm. v. Butler, Lloyd L.
Opinion

7150681891

McDermott, J.

May 15, 2014

## Procedural History

On May 4, 2012, the defendant, Lloyd Butler, was arrested and charged with two counts of First-Degree Murder, as well as Conspiracy, Possession of an Instrument of Crime ("PIC"), and Reckless Endangerment of Another Person ("REAP").[1] On January 24, 2014, the defendant, along with codefendant Zaiee Talbert, appeared before this Court and elected to be tried by a jury.[2]

On February 7, 2014, the jury returned a verdict of guilty as to both counts of First-Degree Murder and PIC as to the defendant, but was unable to reach a verdict as to any of the charges against Talbert. That same day, this Court imposed upon the defendant two mandatory sentences of life imprisonment without parole for First-Degree Murder, as well as a concurrent sentence of one to two years of incarceration for PIC.

---

[1] The defendant is also known as Christopher Butler.
[2] Zaiee Talbert was tried at CP-51-CR-0009688-2012 and CP-51-CR-0009690-2012.



On February 17, 2014, the defendant filed a timely post-sentence motion, which this Court denied on February 20. That same day, the defendant filed a timely Notice of Appeal, and on April 9, 2014, the defendant filed a timely response to this Court's order pursuant to Pa.R.A.P. 1925(b).

## Facts

At approximately 8 p.m. on March 12, 2012, Philadelphia Police Officer Timothy Stephan and his partner and brother, Officer William Stephan, were called to the 2900 block of North 9th Street due to a report of gunshots in the area. Upon arriving at the scene, Officer Timothy Stephan saw an all-terrain vehicle ("ATV") stopped in front of a blue van, and a black male, later identified as Dexter Bowie, suffering from multiple gunshot wounds. Officer Stephan went to the other side of the van, where he saw a black male, later identified as Jonathan Stokley, also suffering from multiple gunshot wounds. Other officers transported Bowie to Temple University Hospital, and medics arrived on the scene and pronounced Stokley to be dead on the scene. N.T. January 27, 2014, pp. 62-69.

In the street near the shooting, Officer Stephan observed numerous fired cartridge casings, both in 7.62 millimeter and 9 millimeter sizes. *Id.* at 68-69. Ballistics evidence confirmed that the shooting was committed with 9 millimeter and 7.62 millimeter ammunition, suggesting that there were two shooters. Casings were recovered by police from all over the street where the shooting occurred, including on both sides of the parked van. N.T. January 29, 2014, pp. 57-59.

Joseph Johnson knew Bowie and Stokley as Bigg and Bird, respectively. He had a close relationship with them, and described them as being like little brothers to him. In a statement given to police, Johnson acknowledged that he was present during the shooting, and that he saw

2

two men who he knew as E-Dollar and Gunna shoot Bowie and Stokley. He identified the defendant as Gunna and his codefendant, Zaiee Talbert, as E-Dollar. He said that Talbert used an AK-47 and the defendant used an automatic handgun. He said that he understood the dispute to be motivated by competition for control of the drug trade on certain neighborhood streets. He also identified the defendant and Talbert in successive photo spreads. C-117 (Statement of Joseph Johnson).

He testified that on the night that they were shot on 9th Street, he was on 8th Street and heard the gunshots. On March 30, 2012, weeks after the shooting, he was arrested in an unrelated incident and was brought to the Homicide Division in order to give a statement about this shooting. During trial, he claimed that he did not read or sign any statement during his time there. When presented with a signed statement, he claimed not to know who made the statement. He was held in custody prior to trial after this Court granted the Commonwealth's material witness petition. Johnson informed the Commonwealth prior to trial that he would refuse to attend. *Id.* at 132-149; C-117 (Statement of Joseph Johnson).

Lydia Santos Morales lived in the neighborhood of the shooting at the time it occurred, and was walking home on the evening of the shooting. When she heard shots fired, she stood against a wall so as not to get shot. She saw one of the shooters fire at Stokley as he tried to crawl underneath the parked van, which she described as a purple van. Then she saw both shooters get into a minivan and drive away. In a statement she gave to police, she identified the defendant as the man she saw shoot Stokley. At trial, she indicated that she did not recognize the defendant but eventually acknowledged that she did identify him in her statement, and that she was extremely reluctant to testify and in fact had run from police who tried to locate her prior to trial. N.T. January 28, 2014, pp. 14-53.

3

Aimes to search for the guns in the creek, but because they were never there he did not find them; later, the defendant admitted that he had retained the guns. C-123(A), Statement of Raheim Aimes.

Erica Holder was in a relationship with the defendant at the time of the shooting. On the afternoon of the shooting, she dropped him off in the neighborhood. Later that night, she realized that she left her cell phone in her car, and when she retrieved it she saw that the defendant had tried to call her. She called him back and he asked her to pick him up. Her testimony indicated that this call, which lasted approximately 20 minutes, encompassed the time of the shooting. When she came to pick up the defendant, he was with Raheim Aimes and both of them left with her to go to her home in the northeast of Philadelphia. The defendant mentioned a fight at the corner store, involving an ATV. Days later, she observed Aimes, the defendant, and Talbert wrapping several guns, including an AK-47, in a blanket. Aimes had a cold at the time, reportedly from looking for the guns in Cobbs Creek. Holder gave a statement to police that was consistent with her testimony; in the statement, she identified Aimes, Talbert, and the defendant. N.T. January 29, 2014 (Vol. I), pp. 49-78.

Phone records indicated that a call was placed between the phones of Holder and the defendant from 7:38 to 8:00 on the night of the shooting. The defendant was on parole at the time and used his aunt's address for that purpose, and would be there every night at approximately 7:30 in order to check in with his parole officer and seem to be in compliance with the conditions of his parole, including a curfew. After checking in, he would usually leave and go to another address on Fillmore Street, thus violating the conditions of his parole. N.T. January 29, 2014 (Vol. II), pp. 23-30.

5

Curtis Stokes had been charged with selling drugs in the neighborhood of the shooting, and was known to spend time there. He testified that on the night of the shooting, he heard fifteen or more shots. When Stokes was interviewed at the Homicide Unit, he removed his wallet to get a piece of paper with the name of a medication that he needed. At that time, the detective with whom he was speaking discovered eight bags of crack cocaine that were also in his wallet. He was arrested for possession of a controlled substance, but was then transported to a hospital so that he could receive his medication. *Id.* at 83-93.

In his statement to police, Stokes said that he saw the decedents, who he knew as Bird and Big[g], riding through the neighborhood on a four-wheeler shortly before they were shot. After they rode through, he saw Talbert, who he knew as E-Man and who was standing with the defendant and Darren Talbert, retrieve a black semiautomatic handgun from underneath a car and stow it in the front pocket of his hoody. Then he saw all three men get into a dark-colored van and drive away. After that night, he did not see any of the three men again. C-116, Statement of Curtis Stokes. He acknowledged at trial that he did not want to testify, for fear of what might happen to him as a result, and claimed that he did not see the shooting. Stokes attempted to evade police contact prior to trial. He was held in custody prior to trial after this Court granted the Commonwealth's material witness petition. N.T. January 29, 2014 (Vol. I), p. 170.

Dr. Aaron Rosen, associate medical examiner for the City of Philadelphia, gave expert testimony that he examined the bodies of both decedents. Bowie's body was shot 13 times, leaving numerous wounds including a penetrating gunshot wound to the back of his head, a penetrating wound that entered his abdominal cavity, rupturing his colon and small intestine, and a penetrating wound to his right chest that ruptured his lung. N.T. January 29, 2014 (Vol. II), pp. 44-68. Dr. Rosen recorded 23 gunshot wounds to Stokley's body. Penetrating gunshot wounds

6

to his back punctured his lungs, aorta, and esophagus. He was also shot in the abdomen and numerous times in the legs. *Id.* at 68-82.

Pursuant to a search warrant executed on March 23, 2012, on the barbershop at 3622 Warnock Street, police recovered a 9mm magazine with 9mm ammunition in it, a ballistic vest, and Aimes' driver's license. N.T. January 30, 2014, pp. 183-184. Police also recovered data from Aimes' cell phone, including a picture of him holding an AK-47. *Id.* at 191-192.[4]

Detective James Dunlap of the Homicide Unit gave expert testimony as to an analysis he performed on cell phone records for the defendant, Aimes, and Talbert, in order to determine the location of the phones at approximately 7:54 p.m. on the night of the shooting. For Aimes' phone, there was no data during the relevant period and an analysis was impossible. The defendant's phone records established that he was within a limited area of the city that is served by certain cellular towers. That area is bounded by 3rd Street to the east, 10th Street to the west, Indiana Avenue to the north, and Dauphin Street to the south; the site of the shooting is within this area. The same data shows that the defendant's phone traveled to the northeast of Philadelphia later that evening, which is consistent with evidence that the defendant went to Erica Holder's home after the shooting. The defendant's cell phone records reflect that on the night of the shooting, it was in use, i.e. on a phone call, for approximately 20 minutes including the time of the shooting. *Id.* at 199, 274-295; C-136, Presentation of Detective Dunlap. Talbert's phone records reveal that he was also in the vicinity of the shooting, and that after the shooting he left the area, relocating to southwest Philadelphia. *Id.* at 219, 295-298; C-136, Presentation of Detective Dunlap.

---

[4] Aimes has an open case in which he is charged with violations of the Uniform Firearms Act, at CP-51-CR-0012739-2012.

the apartment with the AK-47 and hide it under the bed. She also said she saw the white ballistic vest underneath the kitchen sink. N.T. February 3, 2014, pp. 121-146.

Carlita Smith testified for the defendant, her nephew, that he was in her home on the night of the shooting, from 6:30 p.m. to 10 p.m., when he left for his girlfriend's house. She also testified that she had never seen him with a gun in the two months that he lived with her. He lived with her in order to comply with his parole, for which he had a 7 p.m. curfew, though he often left later in the evening to go to his girlfriend's house. *Id.* at 197-202.

## Issues

On appeal, the defendant argues that the verdict was against the weight and sufficiency of the evidence, and that this Court erred when it denied the defendant's motion to suppress his statement.

## Motion to Suppress the Defendant's Statement

On January 23, 2014, this Court litigated the defendant's suppression motion, in which he alleged that he was threatened by detectives who told him that they would arrest his girlfriend and charge her with being the getaway driver for a double homicide, and that they would charge him with the homicides if he did not acknowledge that he was at the scene. The Commonwealth showed a video recording of the defendant's statement being taken, and in that recording it is clear that the defendant is at ease and is not discomfited in any way. Likewise, the record amply established that the defendant was properly Mirandized prior to giving his statement, and in fact his statement contains a signed *Miranda* waiver of rights. Because the defendant failed to substantiate his allegations, and because the record indicated that his statement was voluntary, this Court denied the motion. In its findings of fact, this Court found that the defendant

9

participated actively and voluntarily in giving his statement, at no time protesting or attempting to disengage. This Court concluded that the defendant's statement was freely and voluntarily given. N.T. January 27, 2014, pp. 5-8.

An accused may relinquish his constitutional right to remain silent. *Commonwealth v. D'Amato*, 526 A.2d 300, 306 (Pa. 1987)(*citing Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). A confession given as a result of custodial interrogation is admissible only if the accused's *Miranda* rights have been explained to him and he has knowingly, voluntarily, and intelligently waived those rights. *Commonwealth v. D'Amato*, 526 A.2d 300, 306 (Pa. 1987)(citations omitted).

A law enforcement officer must administer *Miranda* warnings prior to a custodial interrogation. *Commonwealth v. Baker*, 24 A.3d 1006, 1019 (Pa. Super. 2010). The determination of whether an encounter with police is custodial is an objective one, with due consideration given to the reasonable impression conveyed to the person interrogated rather than the strictly subjective view of the trooper or the person being seized, and must be determined by a totality of the circumstances. *Commonwealth v. Pakacki*, 901 A.2d 983, 987-88 (Pa. 2006). Custodial interrogation has been defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way." *Commonwealth v. Johnson*, 541 A.2d 332, 336 (Pa. Super. 1988)(*quoting Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). Police detentions become custodial when, under the totality of the circumstances, the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of an arrest. *Commonwealth v. Ellis*, 549 A.2d 1323, 1332 (Pa. Super. 1988), *appeal denied*, 562 A.2d 824 (1989)(*citing California v. Beheler*, 463 U.S. 1121, 1125 (1983)).

10

Factors utilized by courts to determine whether a detention has become coercive so as to constitute an arrest include the basis for the detention, its length, its location, whether the suspect was transported against his will, whether restraints were used, whether law enforcement showed, threatened, or used force and investigative methods used to confirm or dispel suspicions. *Commonwealth v. Baker*, 24 A.3d 1006, 1020 (Pa. Super. 2011).

In his 1925(b) statement, the defendant does not argue that any particular factor should mandate suppression in this case, but instead merely alleges that the defendant "felt coerced by homicide detectives to make a statement and this statement was not voluntarily made, but was given under duress." 1925(b) Statement, p. 4. Because the defendant has failed to support his allegation, this argument is meritless. The statement itself, which was signed by the defendant numerous times and bears numerous indicia of the defendant's willing participation, belies the defendant's allegation that the defendant was coerced. The record indicates that he came to the Homicide Unit at approximately 1:00 p.m., began giving his statement at approximately 7:40 p.m., and was finished by approximately 11:00 p.m. During the time he was at the Homicide Unit, the defendant smoked several cigarettes, visited the restroom when he wished to, and ate some pizza. There is no indication that he was at all discomfited during the process, let alone coerced.

Further, in his statement he does not acknowledge any involvement in these murders, acknowledging only that he was present when others committed them; therefore, the defendant has failed to establish the "substantial harm and undue prejudice" that he feels he suffered due to the introduction of his statement. In fact, his statement was entirely consistent with his defense, which was that others committed the shootings and he was merely present in the neighborhood when they occurred. Cell phone evidence established that he was in the neighborhood at the

11

time of the shooting, and thus his statement does little to advance the Commonwealth's case. This argument is meritless.

Sufficiency of the Evidence

Evidence presented at trial is sufficient when, viewed in the light most favorable to the Commonwealth as verdict winner, the evidence and all reasonable inferences derived therefrom are sufficient to establish all elements of the offense beyond a reasonable doubt. *Commonwealth v. Baumhammers*, 960 A.2d 59, 68 (Pa. 2008). The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. *Commonwealth v. Estepp*, 17 A.3d 939, 943 (Pa. Super. 2011) (citing *Commonwealth v. Brooks*, 7 A.3d 852, 856-57 (Pa. Super. 2010). The fact-finder is free to believe all, part, or none of the evidence, and credibility determinations rest solely within the purview of the fact-finder. *Commonwealth v. Treiber*, 874 A.2d 26, 30 (Pa. 2005).

18 Pa.C.S. § 2502 establishes that Murder in the First Degree is a criminal homicide committed by an intentional killing. In order to support a charge of murder of the first degree, the Commonwealth must prove that "the defendant acted with a specific intent to kill; that a human being was unlawfully killed; that the person accused did the killing; and that the killing was done with deliberation." *Commonwealth v. Smith*, 861 A.2d 892, 895 (Pa. 2004). "[S]pecific intent can be inferred where a deadly weapon is used upon a vital part of the body." *Commonwealth v. Ramtahal*, 33 A.3d 602, 607 (Pa. 2011)(*citing Commonwealth v. Smith*, 985 A.2d 886, 895 (Pa. 2009). Malice also may be inferred from the use of a deadly weapon upon a vital part of the victim's body. *Commonwealth v. Ramtahal*, 33 A.3d 602, 607-608 (Pa. 2011)(*citing Commonwealth v. Houser*, 18 A.3d 1128, 1134 (Pa. 2011)(finding single bullet

12

fired from an inaccurate handgun at a considerable distance that struck the victim in the buttocks was sufficient to support a finding of premeditation).

Here, there can be no debate as to the degree of homicide, where both of the decedents were shot so many times (13 times and 23 times, respectively) and shot in vital parts of the body such as the head and torso. The murders were manifestly committed with intent to kill.

The eyewitnesses Lydia Morales and Joseph Johnson both gave statements establishing that they saw the defendant, who they knew as "Gunna," shoot at the decedents. Multiple eyewitness statements are obviously sufficient to establish the defendant's guilt. Both witnesses vacillated on the witness stand, but both also made it clear that their reluctance to testify sprung from their fear of being involved in this case.

Further, cell phone data confirms the account of Raheim Aimes, who indicates that the defendant and Talbert committed the shooting and that the defendant spoke later about using his parole curfew as an alibi in order to avoid culpability for his participation in the shooting. Aimes' account is consistent with the ballistics evidence and with Holder's memory of the guns used in the shooting being retained and moved afterward. Put simply, the Commonwealth presented ample evidence to establish that the defendant shot the two victims in this matter, killing them. Because the evidence was more than sufficient, this argument is meritless.

Weight of the Evidence

Weight of the evidence and sufficiency of the evidence are discrete inquiries. An argument that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to sustain the verdict but contends, nevertheless, that the verdict is against the weight of the evidence. *Commonwealth v. Davis*, 799 A.2d 860, 865 (Pa. Super. 2002). An allegation that the verdict is against the weight of the evidence is addressed to the sound

13

## Commonwealth v. Lloyd Butler, CP-51-CR-0009687-2012

## PROOF OF SERVICE

I hereby certify that I am this day serving the foregoing Court Order upon the person(s), and in the manner indicated below, which service satisfies the requirements of Pa. R. Crim. P. 114:

> Philadelphia District Attorney's Office
> Three South Penn Square
> Philadelphia, PA  19107
> Attn: Hugh Burns, ADA

**Type of Service:**     **Interoffice Mail**

> Earl G. Kauffman, Esquire
> The Bourse Suite 755
> 111 S Independence Mall East
> Philadelphia, PA 19106

**Type of Service:**     **First Class Mail**

> Lloyd Butler-EZ-4076
> SCI Graterford
> P.O. Box 244
> Graterford, PA  19426

**Type of Service:**     **Certified Mail**

Dated: May 15, 2014

Bates, Delores
Administrative Assistant to the
Honorable Barbara A. McDermott